**The SIERRA CLUB, Plaintiff,**

v.

**Manuel LUJAN, et al., Defendants.**

**No. Civ. 89–979 PCT PGR.**

United States District Court,
D. Arizona.

July 7, 1989.

**1290**

Mark Hughes and Fern Shepard, Denver, Colo., for plaintiff.

Eugene Cohen, Phoenix, Ariz., for TW Recreational Services.

Arthur G. Garcia, Asst. U.S. Atty., Phoenix, Ariz., for Nat. Park Service.

ROSENBLATT, District Judge.

Pending before the Court is Plaintiff's Motion for Preliminary Injunction. Also pending are the following: 1) Request by Defendant, TW Recreational Services, Inc. for advanced trial on the merits, consolidated with the scheduled preliminary injunction hearing, 2) Motion of TW Recreational Services, Inc. to Strike Newspaper Articles, 3) Motion of TW Recreational Services, Inc. to Strike and Disregard Declarations.

The Court has before it the moving papers together with attached exhibits and declarations. The Court has viewed the site and has had oral argument on the motions.

The four factors which the Court must traditionally consider before granting or denying preliminary injunctive relief are:

1) The likelihood of the plaintiff's success on the merits;

2) The threat of irreparable harm to the plaintiff if the injunction is not imposed;

3) The relative balance of this harm to the plaintiff and the harm to the defendants if the injunction is imposed; and,

4) The public interest.

These factors have been consolidated to a two factor test framed in the alternative. The plaintiff is entitled to preliminary injunctive relief if:

1) It demonstrates a probable success on the merits, and a possibility of irreparable harm;

2) or if it demonstrates a fair chance of success on the merits (i.e. serious questions are raised), and the balance of the hardships tip sharply in its favor.

See *Lopez v. Heckler*, 713 F.2d 1432 (9th Cir.1983).

Importantly, the two factor test is in no way intended to dilute the traditional tests or to provide two separate tests, but are the poles of a continuum. They incorporate the four factors so as to more clearly focus the court's inquiry before it exercises this extraordinary power which is easily abused.

## THE FACTS

In 1976, the National Park Service (NPS) developed a final master plan which included provisions for the North Rim of the Grand Canyon National Park. The NPS is statutorily charged with the preservation of the park and at the same time providing for the public enjoyment of this unparalleled natural wonder. The final master plan acknowledged that the South Rim, which received a vast majority of the visitors, would continue to provide the developments in the form of hotels, motels, campgrounds, restaurants, curio shops, information centers, roads and parking lots necessary to accomodate heavy visitation. It is thus a busy place, receiving in excess of three million visitors in 1988.

The North Rim, being more isolated and fragile, was already less developed and more rustic. It was decided to maintain the peaceful relaxed pace there permitting the visitor to become absorbed in the unique grandeur of the canyon. Development was to be confined to "improve the efficiency of existing facilities." Any expansion of the number of lodging units was to be done through a more efficient utilization of the land already affected by developments, with no significant loss of natural or traditional values. The North Rim is usually open from mid-May to mid-October and is closed during the late fall, winter and early spring. The cabins, which are the primary accommodations, were built in 1928.

There is evidence in the record to show that NPS committed to build a new hotel complex on the North Rim in 1984. The NPS entered into a contract in 1984 with a concessionaire, TW Recreational Services, Inc. (TW) for the construction of a new hotel, (including a restaurant, employee dining facility, lounge, retail shop, parking lot and laundry) together with improved employee housing, new maintenance facilities and other improvements.

Any such improvements would necessarily be subject to the limitations and provisions of the National Environmental Policy Act (NEPA), 42 U.S.C. Secs. 4321–4347, and the National Historic Preservation Act of 1966. The contract acknowledged these requirements. The contract was also specific in providing for the construction, in accordance with a Development Concept Plan and Environmental Statement, of plus or minus 90 overnight guest units.

The record is confusing but with various modifications and interpretations this could consist of raising the number of units from 210 to 302 with a resulting increased capacity from 602 to 1052 guests. The additional hotel or motel units would also require additional employees. Fifty additional campsites are also proposed.

NPS did not complete the NEPA process prior to contracting for the construction of the new hotel complex with TW. While NPS and TW argue that it is not necessary for the agency to comply with the requirements of NEPA including the preparation of an Environmental Impact Study (EIS) before formulating a proposed action, evidence in the record suggests that the subsequent compliance was designed to justify the original proposal, i.e. the contract. A court could conclude from the NPS's commitment to the construction that there was no full and fair consideration of the alternative of refraining from constructing the new hotel.

The focus of the NPS then became not whether to build the hotel but where to build it.

The Developmental Concept Plan (DCP) proposed only three alternatives, 1) No action, 2) Transept Canyon Site, 3) North Rim Inn Site. It failed to include outside the park alternatives. It failed to include restoration of existing cabins and reclaiming those used by employees. It failed to include construction of additional cabins.

The Grand Canyon National Park, North Rim adjoins the Kaibab National Forest. While the record shows that the U.S. Forest Service contemplated adding additional campsites and expanding lodging units, there is nothing indicating there were any discussions with the U.S. Forest Service concerning such visitor facilities.

NPS issued a completed Environmental Assessment (EA) but not until February 1988 which compared and evaluated the determination strategies of only the two locations and no action. The problem addressed was increased visitation to the North Rim and how to accommodate the visitation of those who wished to stay overnight. The EA acknowledged that the additions would not meet current demands nor were they intended to do so. It could thus be inferred that as visitation continued to grow there would be future accommodations necessary providing yet again unmet demands with additional environmental impacts. Visitation has almost doubled over the past 22 years, from 172,000 visitors in 1965 to 322,000 in 1987.

The NPS did not complete a Finding of No Significant Impact (FONSI) on the North Rim development until November 2, 1988. Such a determination may be made if the EA provides sufficient information upon which the agency can determine that the proposed action is not a major federal action significantly affecting the quality of the environment.

While the public comment opportunity resulted in 53 responses, a review of the comments reflects no weighing by the NPS. Those favoring the plan appear to have been tourism and travel related interests as well as governmental agencies from surrounding communities. Those opposed appear to have been visitors. Under any circumstances the balance was a bare majority favoring development and then primarily on the site options.

The selection of the North Rim Inn alternative in the 1989 contract amendment appears to severely impact that area resulting in the removal of a substantial number of existing cabins which are included in the Historical Preservation District and which are listed in the National Register of Historic Places.

While the Arizona Historic Preservation Officer concurred in the removal, a review of the record shows that it appears to have been capitulation rather than approval, it being represented that there was no feasible option for retaining the cabins in place.

Building the hotel and removing the existing cabins constitutes a substantial change in the rustic traditional setting. It changes the setting primarily from cabins and campsites to primarily hotel/motel rooms and campsites, together with a large adjoining parking lot.

By filing public comments received in response to the North Rim Development Concept Plan and Environmental Assessment, together with all of the NPS documents previously filed by the parties in this action, the complete "administrative record" of the NPS regarding the North Rim development is certified to be before the Court. The plaintiff objects that the record is not complete. Presuming, for purposes of preliminary injunction that it is complete, it is not extensive and the Court might give credence to the plaintiff's claim that the NPS's failure to provide the record under the Freedom of Information Act (FOIA), 5 U.S.C. Sec. 552 was intended to forestall opposition to the hotel project.

While the record reflects a variety of reviews of the existing water supply system resulting in a conclusion that certain measures could accommodate the planned additions, all of the opinions conclude that the water distribution system is in need of major repair and total replacement whether or not the hotel project was undertaken.

The concessionaire has committed the expenditure of funds as provided in the contract (a total of 5.7 million dollars). It needs to know if it can go forward with the project during the short construction season. There are severe time constraints on the parties and the Court for a preliminary ruling. Because of the short construction season any delay will have economic impacts on TW.

## THE LAW

The National Environmental Policy Act (NEPA) and its implementing regulations require government officials to consider environmental issues and to complete a valid analysis before undertaking or committing to undertake a project. 42 U.S.C. Secs. 4332(C), 4332(E). *Cady v. Morton,* 527 F.2d 786 (9th Cir.1975).

While the agency has broad discretion in determining when to do an EA/EIS and while NEPA only prescribes the necessary process and does not mandate particular results, *post hoc* compliance with NEPA is unlawful. *Robertson v. Methow Valley Citizens Council,* — U.S. —, 109 S.Ct. 1835, 104 L.Ed.2d 351 (1989); *Cady v. Morton,* 527 F.2d 786 (9th Cir. 1975).

NPS must adhere to its Management Policies unless those policies are waived by the Secretary of the Interior, the Assistant Secretary, or the Director of the Park Service.

The defendants raise the defense of laches. Laches is an equitable defense which cannot be and is not limited to a review of the record. The defense requires proof of (1) lack of diligence, and (2) prejudice, questions of fact which, in this case, require evidence beyond the administrative record.

The findings and conclusions made by this Court are not intended to be final or conclusive. They are sufficient however for the Court to determine that the plaintiff has made an adequate showing of fair to probable success on the merits, the raising of serious questions, and with a sharp tipping of the balance of hardships in its favor. The denial of the preliminary injunction would cause irreparable harm to the Bright Angel Point/North Rim environment. The public interest is obvious.

The Agency's decision in this case may well have been arbitrary and capricious, ranging from its committment to the project to the determination not to prepare an EIS.

## ORDER

IT IS ORDERED that Plaintiff's Motion for Preliminary Injunction is GRANTED. The defendants are preliminarily enjoined from proceeding with the construction of the restaurant, hotel buildings, parking lot and any other construction or removal of cabins or trees in the North Rim Inn area known as the expansion of services at the North Rim Inn alternative.

The reasons for the issuance of this order are that the plaintiff has demonstrated a fair to probable success on the merits, the raising of serious questions, with a sharp tipping of the balance of hardships in its favor. The denial of the preliminary injunction would cause irreparable harm to the North Rim environment. It is in the public interest that the preliminary injunction issue.

This order is binding on all of the defendants in this action, their officers, agents, servants, employees and attorneys, and those persons in active concert or participation including contractors and subcontractors who receive actual notice of the order by personal service or otherwise.

The defendants are not enjoined from proceeding with the employee housing construction or other aspects of the overall project.

Until further order of the Court the $1000 bond set for the Temporary Restraining Order shall remain posted for the Preliminary Injunction.

The Request for Advanced Trial on the Merits, Consolidated with the Preliminary Injunction Hearing is DENIED.

The Motion of TW Recreational Services, Inc. to Strike Newspaper Articles is DENIED.

The Motion of TW Recreational Services, Inc. to Strike and Disregard Declarations is DENIED.