| | Predominantly Black Precincts | Predominantly White Precincts |
|---|---|---|
| | % of Voters Voting for Black Candidate | % of Voters Voting for Black Candidate |
| <u>Fourth Circuit</u> | | |
| <u>1972 Primary</u> | | |
| Leander Shaw | | |
| Circuit | 90 | 25 |
| Duval Co. Only | 90 | 24 |
| <u>1972 Runoff</u> | | |
| Leander Shaw | | |
| Circuit | 96 | 34 |
| Duval Co. Only | 96 | 34 |
| <u>1978 Primary</u> | | |
| Harrell Buggs | | |
| Circuit | 76 | 6 |
| Duval Co. Only | 76 | 6 |
| <u>Duval Co. Judge</u> | | |
| 1978 Primary A. Washington | 85 | 14 |
| 1984 Primary Group 4 Denise Prescod | 72 | 33 |
| 1984 Primary Group 8 Deitra Micks | 74 | 8 |

**PROTECT KEY WEST, INC., a Florida Not–for–Profit Corporation, d/b/a Last Stand, Plaintiff,**

v.

**Richard CHENEY, Secretary of Defense of the United States of America, H. Lawrence Garrett III, as Secretary of the Navy, and Admiral Frank B. Kelso, as Chief of Naval Operations, United States Navy, Defendants.**

No. 91–10054–CIV–KING.

United States District Court, S.D. Florida.

March 30, 1992.

Joel H. Sachs, White Plains, N.Y., Leonard Sands, Coconut Grove, Fla., for plaintiff.

Theresa J. Davenport, Asst. U.S. Atty., Miami, Fla., Pauline H. Milius, U.S. Dept. of Justice, General Litigation Section, Environment and Natural Resources Div., Washington, D.C., for defendant.

OPINION, ORDER OF REMAND, ORDER OF INJUNCTION, AND FINAL ORDER OF DISMISSAL WITH JURISDICTION RETAINED TO ENFORCE

JAMES LAWRENCE KING, District Judge.

THIS CASE was tried, by agreement of the parties and pursuant to Fed.R.Civ.P. 65(a)(2), on March 12, 1992 in a non-jury final hearing on all issues. This Memorandum Opinion, incorporating findings of fact and conclusions of law and final decree, is entered after careful consideration of the record, the evidence introduced during the trial, the oral argument of counsel, and the briefs of the parties.

Plaintiff Protect Key West, Inc., d/b/a Last Stand ("Protect Key West") filed this action on June 4, 1991, against Defendants Richard Cheney, Secretary of Defense of the United States of America; H. Lawrence Garrett III, as Secretary of the Navy; and Admiral Frank B. Kelso, as Chief of Naval Operations, United States Navy. The Complaint alleged that the Defendants had violated the National Environmental Protection Act ("NEPA"), 42 U.S.C. §§ 4321 *et seq.;* regulations of the Council on Environ-

mental Equality ("CEQ") for implementing NEPA, 40 C.F.R. Part 1500 *et seq.;* regulations of the United States Department of Defense for implementing NEPA, 32 C.F.R. Part 214; regulations of the United States Department of the Navy for implementing NEPA, 32 C.F.R. Part 774; and the Federal Coastal Zone Management Act of 1982 ("CZMA"), 16 U.S.C. §§ 1451 *et seq.* The Complaint sought an injunction against the further governmental action until the Navy complied in full with the requirements set out above.

The alleged violations center around the Navy's preparation of an Environmental Assessment ("EA") dated September 1988 for a housing project known as Peary Court, located in the City of Key West, Florida (the "City"). Plaintiff contends that the EA, the Finding of No Significant Impact ("FONSI") published in a City newspaper on February 6 through 8, 1989, and the Navy's decision to build on Peary Court violate the letter and spirit of NEPA, regulations implementing NEPA, and CZMA. The Navy answers that all of its actions and decisions are in full compliance with federal law.

On December 17, 1991, Plaintiff filed a motion for preliminary injunction. By order dated December 19, 1991, this Court referred the motion to Magistrate Judge Stephen T. Brown for a Report and Recommendation. After an evidentiary hearing on the motion on February 6 and 7, 1992, Magistrate Judge Brown recommended denial of preliminary injunctive relief on February 25, 1992. Plaintiff subsequently moved for a temporary restraining order ("TRO"), alleging that "mobilization" was commencing and construction imminent. This Court granted the TRO on March 6, and set a trial on the merits for March 12, 1992.

At the trial, the parties introduced documentary evidence, including the administrative record ("AR"), and the record from the hearing held by Magistrate Judge Brown. The Court heard from Dennis Wardlow, Mayor of the City of Key West, as amicus curiae in his personal capacity.

## FINDINGS OF FACT

### I. BACKGROUND

At issue in this cause is the construction of 160 homes for military personnel on Peary Court, a 28.65–acre parcel of land located in Key West, Florida. (AR 11) It is a part of the Trumbo Point Naval Air Station situated east of White Street and south of Palm Avenue, across from the main entrance to Trumbo Annex. Although not included in the City's Historic District, the property abuts the District on two sides. (AR 45, 125)

The site was used as United States Army barracks for approximately 120 years, from 1831 to 1951. (AR 180) In 1951 the barracks were demolished and housing for Navy personnel was constructed on the site ("Wherry Housing"). In 1974, Wherry Housing was demolished and most of the site was cleared, with the exception of the streets and some concrete foundations. (AR 63) The land is currently vacant except for a small Credit Union building which occupies 0.8 acres. (AR 8)

From 1974 through 1985, Naval Air Station Key West ("NAS Key West") granted the City a series of one-year leases. In 1985, the Navy granted the City a five-year lease. (AR 8, 63, 114) The City utilized the property primarily for recreational purposes, constructing a central ballfield on the property shortly after obtaining the license and a smaller ballfield several years later. (AR 63) In addition, the City requested and was given permission to use the site for a recycling center, among other things. (AR 8) When the City's license expired in November 1990, the Navy requested the City to vacate the site. (AR 144)

The administrative record reflects the Navy's longstanding plans to reconstruct military housing on the site. (AR 10: Master Plan for Naval Complex, dated Sept. 1981) On July 1, 1987, the Navy and Coast Guard entered into an agreement by which the Coast Guard would seek to fund the construction of 226 units of family housing on Navy-controlled property. (AR 26) The Navy would build, manage, and maintain

the units and they would be made available to families of all the military services in the Key West area. (AR 13) Thereafter the Navy determined to construct such housing for some 160 families. (AR 13, 26, 31)

The Court finds that this project, known as Peary Court, is a major federal action.

In preparation for the Peary Court project, the Navy prepared an Environmental Assessment ("EA"). (AR 45) The sufficiency of this EA is the focus of the present action. A draft EA was prepared in April 1988. (Exh. T, # 8) The final EA is dated September 1988. (AR 45)

On December 22, 1988, the Chief of Naval Operations informed the Naval Facilities Engineering Command in Charleston, South Carolina, that the EA had been reviewed and a determination made that preparing an Environmental Impact Statement ("EIS") was not required. (AR 58) Accordingly, the direction was given to publish the Notice of Finding of No Significant Impact ("FONSI") and the availability of the EA in the local Key West newspaper. (AR 58, 61) This publication was made in the Key West Citizen on February 6, 7, and 8, 1989. (AR 67) The notice stated that an EA had been prepared, and that the Navy would forego preparation of an EIS. The notice also specified how interested parties could obtain a copy of the EA.

Only one request was made for the EA. Then-Commissioner Harry Powell requested and received a copy of the EA on February 8, 1989. (AR 73) No written comments were submitted to the Navy regarding the EA or FONSI in response to the publication.

At the public hearing held on the proposed project on May 31, 1990, a number of people attended and spoke, including Commissioner Harry Powell, Sharon Wells, Mayor Anthony Tarracino, and Theodore Strader. (AR 107)

## II. LEAD AGENCY

The Court finds that the Navy is the appropriate lead agency for the Peary Court project. The Navy owns the property and is ultimately responsible for its disposition.

## III. THE EA

The EA is an 11-page document including three pages of maps. It consists of an introduction, four discussion sections, and a conclusion. (AR 45) The EA is attached as an exhibit hereto.

The EA first discusses the need for housing, noting among other things that increased tourism and lack of developable land in the Florida Keys had substantially increased rents and adversely affected housing availability in the Key West area. (AR 45)

Section II is entitled "Alternatives." The EA first describes the proposed action, addresses alternative sites, and explains why "no action" has been eliminated. (AR 45)

Section III of the EA is called "Affected Environment" and describes the site physically, explaining the environmental conditions of Key West generally. (AR 45)

Section IV, "Environmental Consequences," lists nine area of environmental effect (Biological Resources, Noise, Air, Hydrology, Cultural Resources, Traffic and Circulation; Land Use and Visual Resources, Socioeconomics, and Energy Resources). Each of these consists of one-sentence to one-paragraph statements that there will be no significant adverse result from the project. (AR 45)

Finally, the EA concludes that the project would not significantly affect the environment. (AR 45)

Plaintiff has alleged several deficiencies in the EA, addressed below.

## IV. STORMWATER RUNOFF

In the "Land Use and Visual Resources" section, the EA states that "permits relating to storm water ... will be obtained." (AR 45) In the "Hydrology" section, the EA notes that "[d]rainage can be handled through the existing system with minor improvements." (AR 45)

While the EA was being prepared, the Navy, in August 1988, met with the City Engineer for the City to discuss the exist-

ing drainage at the Peary Court site and other requirements. (AR 236, Part 7–147) In addition, the Navy had a Site Engineering Investigation Report prepared for the Peary Court site which included a topographic survey, geotechnical investigation, utilities investigation, and a storm water management report. This report is part of the Navy's Request for Proposal ("RFP"), through which the Navy conveys to the design and construction contractors the technical specifications that must be met. (AR 236, Part 7) (not dated) The stormwater management report states that a surface water permit will be needed from the South Florida Water Management District ("SFWMD") and that the storm drainage must be designed and constructed in accordance with the "Basis of Review for Surface Water Management Permits Applications" within the SFWMD. (AR 236, Part 2–19, Part 7–18) The SFWMD is charged with identifying the significant environmental features of the project which relate to water resources, evaluate the impact of the project on those water resources, and either issue or deny a permit application. (AR 236, Part 7–199) SFWMD's responsibility in the permit process is to ensure that the applicant's proposed design will not be harmful to water resources or inconsistent with the public interest. (AR 236, Part 7–193) The Navy's contractor has applied for a permit and has submitted its drainage system design to the SFWMD which is completing its review.

The Navy has still not conducted any hydrology studies addressing issues of drainage, possible contamination of stormwater runoff, possible contamination of Florida Bay and impact on the Lens aquifer underlying Peary Court. The Navy regards these as design rather than environmental issues, to be resolved when construction is underway.

Puriegton Howanitz, Director of Public Works for the City and an expert in water, water quality, stormwater, and drainage systems, has expressed concern about stormwater runoff in the vicinity of Peary Court. In particular, there is flooding on Palm Avenue at the intersection with White Street from 1980 to the present as a result of stormwater runoff. (Howanitz Aff., Exh. 5, at 1–3) Howanitz testified that the runoff will be exacerbated if Peary Court is built. (Howanitz Deposition at 34, 60–62) Theodore C. Strader, an expert in City Planning, concurs. (Strader Deposition, Exh. 9, at 69–70; Exh. BB, at 10–11, 14–15) The construction of houses and parking areas will likely contaminate the Lens aquifer. (Exh. BB, at 18–25)

## V. HISTORIC DISTRICT

In the Cultural Resources section, the EA states that "[c]ompliance with requirements for juxtaposition of new construction with the Historical District will be ensured." (AR 45) The EA also states that the Historic District will be taken into consideration in the design of the housing units, under "Land Use and Visual Resources." (AR 45)

During 1988, meetings and discussion of building plans were held between representatives of the Navy and the City, which included members of the Historical Architectural Review Commission ("HARC") and the Historic Florida Keys Preservation Board ("Preservation Board"). (AR 52, 53, 54, 66, 83, 89) The Navy now takes the position that the Peary Court project's compatibility with the Historic District has been assured through coordination between the Navy and the Florida State Historical Preservation Office ("SHPO"). (AR 91, 92, 100, 102, 107, 113–14, 123, 125, 135, 137, 149, 152, 162, 167, 176, 178–79, 181–82, 184–85, 193, 211, 228–29)

In accordance with § 106 of the NHPA, the Navy entered into a Memorandum of Agreement ("MOA") with SHPO and the Advisory Council in November 1990. (AR 149) Among other things, the Navy agreed that archeological and traffic studies would be prepared; that SHPO and the City would review the proposed housing, landscaping, and road improvement plans; and that the architectural design of the proposed housing would be compatible with the adjacent historic district. (AR 149) After this suit was filed, and in accordance with the MOA, the Navy forwarded the

project design to the City and SHPO for review on November 5, 1991. (AR 224, 225) Comments were returned on December 20, 1991. (AR 231) The Navy took the SHPO/City comments into account, including a meeting with SHPO staff on January 17, 1992. (Exh. R; Exh. 2) A few weeks ago, on February 18, 1992, SHPO responded that the project was "consistent with the *Secretary of Interior's Standards for Rehabilitation."* (Exh. 24)

Sharon L. Wells, an expert in history and historic preservation, has said that the architecture of the Peary Court project is incompatible with the Historic District. (Wells Aff., Exh. 12, at 54) She stated that added vehicles from the families living in Peary Court will exacerbate traffic conditions in the Historic District. (Wells Aff. at 8) Eugene E. Burr, an expert in planning and architecture, believes that the changed traffic patterns will have a significant impact upon the Historic District. (Burr Deposition, at 41–43)

## VI. ALTERNATIVE SITES

In terms of alternatives to the Peary Court site, the EA states simply:

B. Locate on Another Site

This alternative was rejected because there is no other Navy-owned land available that has the advantages of the preferred site. Non–Navy land is practically nonexistent and would require the expenditure of capital funds for land purchase.

(AR 45)

Plaintiff complains that the Navy did not adequately take into account the alternatives to building at Peary Court. The Navy prepared a Case Alternative Report which analyzed all reasonable alternatives in the Key West area. (AR 114) (not dated) The report considers sixteen possibilities to provide the required housing, including Peary Court and other potential sites, as well as alternative means of obtaining housing (e.g., purchase of existing housing). (AR 114) In August 1990, this report was distributed for review to SHPO, NAS Key West, the City, HARC, the Historic Florida Keys Preservation Board, and

the Advisory Council on Historic Preservation. (AR 113, 114)

## VII. TREES

Under Biological Resources, the EA notes and the Court finds that the only substantial vegetation on the site is trees; that no threatened or endangered species of plant life or wildlife occupy the site; and that no wetlands will be impacted. (AR 45)

The Navy states that as early as October 1988 made a commitment to preserve the trees on the site and so notified HARC. (AR 52) The Navy's contractor will be required to build around existing trees at Peary Court, and all protected trees will remain undisturbed. (AR 234)

A number of the Plaintiff's affiants expressed concern that the Peary Court project could result in the loss of valuable "specimen trees." (Wells Aff. at 6–7; Burns Aff. at 3; Stewart Aff. at 3)

## VIII. TRAFFIC

The EA states that there will be an increase of approximately 240 vehicles utilizing the streets in and around Peary Court, but that there should be no significant increase in traffic congestion because the roads will be relocated and realigned. (AR 45)

The City submitted several proposed traffic circulation plans to the Navy which were duly considered. (AR 54, 66) The City's proposal to move the Palm Avenue entrance and exit was endorsed by NAS Key West. (AR 54) After Plaintiff filed this suit, the Navy in October 1991 produced a document called "Traffic Impact Study for Peary Court Housing Area Trumbo Point Annex NAS Key West, Florida" ("Traffic Study"), which concluded that traffic conditions would improve on White Street and worsen slightly on Palm Avenue, that the proposed design would reduce cut-through and commercial traffic while adding a small amount of residential traffic in the area of White and Southard Streets, and that the only significant traffic effect of the project would be the reduction of traffic on Southard Street. (AR 229) This

Traffic Study, which was conducted four months after the litigation was commenced, was distributed for review to SHPO, NAS Key West, the City, and the Advisory Council on Historic Preservation. (AR 226–28)

David A. Ornstein, A.I.C.P., an expert in planning, testified that Palm Avenue, between North Roosevelt Boulevard and White Street, was overburdened with traffic in 1987 and has the State's lowest level of service at present. (Ornstein Aff., Exh. AA, at 11–14; Ornstein Deposition, at 35) It was his opinion that the addition of traffic from the new families will have a significant impact on the already overburdened Palm Avenue. (Ornstein Aff. at 14, Strader Aff., Exh. BB, at 3–4)

Mr. Strader testified that the Navy study is inaccurate because normal traffic flows during the study had been interrupted for unrelated highway construction along Roosevelt Avenue, making the Traffic Studies' figures unreliable. Further, Strader states that the negative traffic impact in this area is unavoidable. Palm avenue cannot be widened because it flows into the narrow Palm Avenue Bridge. (Strader Aff. at 5, 8–10)

## IX. PROTECTION OF ARCHEOLOGICAL REMAINS

As agreed in the MOA, an archeological survey was carried out pursuant to Department of Interior procedures. (AR 181, "Executive Summary") (dated Mar. 6, 1991) The report of the investigation called for preservation and maintenance of an area that had been the previous site of a cemetery, a well at cistern 10, and an area of suspected wells under the loop road. (AR 181 at 38, 39; AR 182) As a result of this archeological survey, the cemetery will be protected. (AR 181, 182) SHPO gave its approval and concurred in the matter in March 1991, (AR 184). Plaintiff agrees that its concerns have been satisfied. (Burr Deposition, Exh. 3, at 34; Wells Deposition, Exh. 12, at 32–33)

## CONCLUSIONS OF LAW

### I. STANDARD OF REVIEW

Before the Court undertakes a substantive review of the requirements of NEPA, it is necessary to determine the appropriate standard of review. The Eleventh Circuit has reviewed a federal agency's decision not to prepare an Environmental Impact Statement under "a standard of reasonableness," specifically rejecting the more narrow "arbitrary and capricious" standard. *See C.A.R.E. Now, Inc. v. Federal Aviation Admin.*, 844 F.2d 1569, 1572 (11th Cir.), *reh'g denied, en banc* 854 F.2d 1326 (1988). The court concluded that NEPA required a higher level of review than that ordinarily employed in reviewing agency action under the Administrative Procedure Act.[1] *Id.* at 1572–73 n. 3. Using that level of scrutiny, the court found that the Federal Aviation Administration's issuance of a Finding of No Significant Impact for an airport runway extension project was reasonable, setting out its mission by stating: "[O]ur task is not to choose the best alternative, but to ascertain that the FAA made a 'reasoned choice' among these alternatives." *Id.* at 1574. The court analyzed the merits of each proposed alternative considered by the FAA before the agency reached its conclusion. Thus, while the court accorded broad discretion to the agency in selecting the *best* option, the procedure by which that decision was made was subjected to review. The FAA was compelled to justify the reasoning and factual conclusions contained its EA and subsequent FONSI.

Since *C.A.R.E.* was decided, the Supreme Court has held in *Marsh v. Oregon Natural Resources Council*, 490 U.S. 360, 109 S.Ct. 1851, 104 L.Ed.2d 377 (1989), that the appropriate standard of review of an agency's determination not to prepare a supplemental EIS is the "arbitrary and capricious" standard. The Eleventh Circuit subsequently adopted this standard for determining the adequacy of an EIS. *See North*

---

1. 5 U.S.C. § 706(2)(A) provides that the "reviewing court shall ... set aside agency action, findings and conclusions found to be—arbitrary, capricious, an abuse of discretion or otherwise not in accordance with law."

*Buckhead Civic Ass'n v. Skinner,* 903 F.2d 1533, 1538 (11th Cir.1990).

In practice, the standards tend to merge. As the Supreme Court has noted, the difference between the two standards is "not of great pragmatic consequence. [O]ur decision today will not require a substantial reworking of long-established NEPA law." *Marsh,* 109 S.Ct. at 1861 n. 23 (citations omitted); *see also Manasota–88, Inc. v. Thomas,* 799 F.2d 687, 692 n. 8 (11th Cir. 1986) (difference between standards is "often difficult to discern"). Under either standard, the reviewing court must "ensure that agency decisions are founded on a reasoned evaluation 'of the relevant factors.'" *Marsh,* 109 S.Ct. at 1861.

■ The Court's role in this case is thus carefully circumscribed. The merits of the Peary Court proposal *per se* are not before the Court. Nor may this Judge call into question any reasonable agency methodologies used in arriving at its conclusion. Rather, the Court's review is limited to ensuring that the process that produced the result complies with NEPA. The Court is obligated to scrutinize the analysis and conclusions reached in the EA for evidence of such compliance.

## II. EVALUATION OF THE ENVIRONMENTAL ASSESSMENT AND FONSI

### A. *Inadequacy of Environmental Assessment*

The original EA prepared for the Peary Court Project consists of eight typewritten pages, exclusive of three area maps, with just over two pages devoted to "Environ-

mental Consequences." Each of the potential environmental impacts addressed therein is dismissed in conclusory "findings," without further discussion or even citation.[2] The FONSI itself simply restates the conclusions of the EA. (AR 67)

The District of Columbia Circuit has established four useful criteria for reviewing an agency decision to forego preparation of an EIS: (1) whether the agency took a "hard look" at the problem; (2) whether the agency identified the relevant areas of environmental concern; (3) as to the problems studied and identified, whether the agency made a convincing case that the impact was insignificant; and (4) if there was impact of true significance, whether the agency convincingly established that the changes in the project sufficiently reduced it to a minimum. *See Cabinet Mountains Wilderness v. Peterson,* 685 F.2d 678, 682 (D.C.Cir.1982) (citation omitted).

■ Carefully comparing the procedure followed by the Navy in preparing the EA on Peary Court with what is required by law, *see id.* at 682, leads to the inescapable conclusion that the September 1988 EA was wholly inadequate. Far from the requisite "hard look," the Navy barely took *any* look at the environmental consequences of the project in the EA. Because the EA does not evince a good faith effort to "study and identify" relevant problems and alternatives, any analysis of whether the Navy "convincingly" established the insignificance or planned mitigation of environmental harms would be pointless. There is no formal study, informal docu-

---

**2.** The EA is attached to this Order as an exhibit. Unnumbered pages 8 and 9 contain the Navy's discussion of environmental consequences. The impacts are dismissed in short paragraphs of no more than a few sentences. The Navy makes the following statements, with little or no further elaboration:

A. Biological Resources. "No significant biological impacts would result from construction on this site."
B. Noise. "There will be no significant increase in noise generated by this project."
C. Air. "There will be no significant increase in air pollution due to the proposed action."

D. Hydrology. "Drainage can be handled through the existing system with minor improvements."
E. Cultural Resources. "Because there are no significant cultural resources on the land proposed for the action, no significant impacts to cultural resources are expected. Compliance with requirements for juxtaposition of new construction with the Historical District will be ensured."
F. Traffic and Circulation. "Although there will be an increase in approximately 240 vehicles utilizing the streets and intersections around Peary Court, there should be no significant increase in traffic congestion."

mentation, or even informal agency discussion referenced in the EA. Because the EA does not state that any other agency or organization was involved or consulted in its preparation, the Court concludes that this did not occur. As to each potential impact, the EA merely restates its own ultimate conclusion that no problems will result from any of the contemplated action. Alternatives are not specifically mentioned, but for a two-sentence dismissal of the option, "Locate on Another Site."

The Navy prudently does not attempt to defend this action solely on the adequacy of the EA. Indeed, the Mayor of Key West, as amicus curiae testifying in favor of the construction of military housing on the site, noted: "[i]f all the Court had to look at was the original Environmental Assessment from 1988, the Court would have to find that the decision to reconstruct the military housing at Peary Court was arbitrary and capricious." Prop.Fin.Ord. and Op. at 8.

The Court finds that the 1988 EA prepared by the Navy fails to meet the requirements of NEPA.

### B. *"Cure" by Subsequent Documentation*

■ The Navy and amicus argue that the studies, surveys, and investigations conducted after the decision was made to proceed with the Peary Court project "cure" any defects in the original EA. Defendants contend that these studies, taken together, satisfy the requirement for preparation of an EA, and support the 1988 Finding of No Significant Impact. Plaintiff responds that the subsequent studies, reports, analyses, performed after the fact, cannot and do not cure the defective EA. Plaintiff urges the Court to order the Defendants to prepare a full EIS, because the project will have a significant impact on the environment.

Resolution of this controversy cuts to the heart of NEPA's mandate. A review of NEPA and the EA's role in the statutory scheme is necessary before the Court considers the Navy's theory that its subsequent studies and analyses meet the statutory requirements, thus "curing" the EA.

#### 1. NEPA and Regulations Promulgated Thereunder

The National Environmental Policy Act of 1969 sets forth a "national policy which will encourage productive and enjoyable harmony between man and his environment [and] promote efforts which will prevent or eliminate damage to the environment and biosphere and stimulate the health and welfare of man." 42 U.S.C. § 4321.

The Eleventh Circuit has recently explained the genesis and overall approach of the Act:

> Prior to the passage of [NEPA], environmental considerations were systematically underrepresented in the federal agency decision making process. Consistent with traditional notions of natural resource allocation, the benefits of development were overstressed and less environmentally damaging alternatives for meeting program objectives were often given limited consideration. NEPA declares a broad national commitment to protecting and promoting environmental quality. This commitment is implemented by focusing government and public attention on the environmental effects of proposed agency action; *The Act ensures that important environmental consequences will not be "overlooked or underestimated only to be discovered after resources have been committed or the die otherwise cast." In short, NEPA requires that the evaluation of a project's environmental consequences take place early in the project's planning process.*

*North Buckhead,* 903 F.2d at 1539–40 (emphasis added) (citation omitted).

NEPA does not set out substantive environmental standards, nor prescribe any regulatory program. Rather, the congressional mandate of § 4321 is realized through a set of "action forcing" *procedures* that require an agency to take a "hard look" at environmental consequences. *Robertson v. Methow Valley Citizens Council,* 490 U.S. 332, 109 S.Ct. 1835, 1846, 104 L.Ed.2d 351 (1989); *Vermont Yankee Nuclear Power Corp. v. Natural Resources Defense Council,* 435 U.S. 519,

558, 98 S.Ct. 1197, 1219, 55 L.Ed.2d 460 (1978) (mandate to agencies under NEPA is "essentially procedural"). The procedural requirements derive from 42 U.S.C. § 4332(2)(C)(i-iv), which directs all agencies of the federal government to prepare for "major Federal actions" a detailed statement on (1) the environmental impact of the proposed action; (ii) any unavoidable adverse environmental effects if a project is implemented; (iii) alternatives to the proposed action; (iv) the relationship between short-term uses of the environment and maintenance of long-term productivity; and (v) any irreversible and irretrievable commitments of resources involved in the project's implementation.

Pursuant to Executive Order,[3] the Council on Environmental Quality was directed to promulgate regulations binding on all federal agencies for the implementation of NEPA. These regulations, promulgated in late 1978, codified and clarified much of the established procedure under the statute. The first step in the compliance process is the preparation of an "Environmental Assessment," defined in relevant part as "a concise public document ... which serves to: Briefly provide sufficient evidence and analysis for determining whether to prepare an environmental impact statement or a finding of no significant impact[; and] Shall include brief discussions of the need for the proposal, of alternatives as required by [§ 4332(2)(E) ] of the environmental impacts of the proposed action and the alternatives, and a listing of agencies and persons consulted." 40 C.F.R. § 1508.9 (1991).

Based on the EA, an agency decides whether to prepare an "Environmental Impact Statement." 40 C.F.R. § 1501.4(c). An EIS is an exhaustive analysis of the impacts, proposed mitigation, and alternatives to the federal project, which has been circulated to other involved agencies, *see* § 1502.19, subject to public comment and agency response, *see* § 1503, reviewed by the CEQ in case of interagency disagreement, *see* § 1504, and ultimately submitted to the President. The EIS, therefore, is the primary vehicle for compliance with

NEPA where a project will have a significant impact on the environment. The EIS is the "action forcing" device envisioned by Congress to insure that NEPA's policies and goals are infused into federal decision-making. 40 C.F.R. § 1502.1.

Therefore, the EA is a fundamental crossroads in the process. Based upon the EA's analysis and conclusions, an agency may issue a FONSI, thereby terminating the NEPA process, *or* proceed to the next phase by preparing an EIS. In effect, the EA and decision to issue a FONSI based thereon remove an agency from any further obligations under NEPA.

2. "Commit First, Ask Questions Later?"

Against this statutory background, it is clear that the Navy's theory of "cure" in this case would violate the letter and spirit of NEPA.

The documentation offered in support of the EA's "findings" was prepared *after* the EA and FONSI were issued. Indeed, Defendants' response to Plaintiff's interrogatories indicates that no written studies, analyses or reports on any environmental issue were prepared from the time the project was initially considered until the EA was issued in September 1988. Certain studies were conducted as the project went to bid; a traffic impact study was not conducted until October 1991, four months after this litigation was commenced. The record reflects that the analyses of environmental issues produced after the EA was issued are by-products of the myriad engineering and other technical studies conducted subsequent to the decision to build on the Peary Court site. The Navy argues that these studies support the agency's earlier finding of no significant impact.

Accepting the Navy's argument would render the EA/FONSI process a mere formality. As in this case, an agency could issue a perfunctory EA (and FONSI based thereon), and proceed with a project unhindered by further NEPA requirements. If challenged, the agency could support its *pro forma* EA with whatever studies were produced in the course of implementing the

---

**3.** *See* Executive Order 11514 (Mar. 5, 1970) as amended by Executive Order 11991 (May 24, 1977).

proposal. Any remaining environmental problems could be resolved after the decision to go forward with the project was actually made.

This result is not what Congress intended. The Act's effectiveness depends on involving environmental considerations in the initial decisionmaking process. *See Robertson*, 109 S.Ct. at 1845 (NEPA goals achieved during period when agency is "contemplating a major action"); *see also* 40 C.F.R. § 1501.2 ("Agencies shall integrate the NEPA process with other planning at the earliest possible time to insure that planning and decisions reflect environmental values, to avoid delays ..., and to head off potential conflicts); 40 C.F.R. § 1500.1 ("NEPA procedures must insure that environmental information is available to public officials before decisions are made and before actions are taken"). In the NEPA context, *post hoc* compliance *by definition* does not accord with the congressional mandate. *See Sierra Club v. Lujan*, 716 F.Supp. 1289 (D.Ariz.1989); *Cady v. Morton*, 527 F.2d 786, 794 (9th Cir.1975).

The Court is not unaware of the onerous burden that this law places on an agency desiring to move forward efficiently and expeditiously. The law must nonetheless be followed.

The Navy has failed to demonstrate evidence of NEPA compliance before committing to the Peary Court project.

## III. REMEDY

### A. Remand

The preceding finding of a NEPA violation does not determine the appropriate remedy. Clearly, Congress did not intend that an agency have only "one bite at the apple" in attempting to comply with the statute. The Court now turns to equitable considerations.

The Navy's most persuasive argument against the injunctive relief sought by Plaintiff is that nothing but delay would be accomplished by a remand to the agency for further NEPA proceedings. Both during the Magistrate Judge's hearing and at trial, the Navy argued that subsequent studies confirmed the findings of the EA. Remand, Defendants suggest, would be pointless because each potential harm of concern to Plaintiff was either insignificant or mitigated as the design of the project progressed. *See* Defs' Mem. in Opp. to Prel.Inj. at 17–27.[4]

The Court is mindful of the strong policy against sanctioning delay for the sake of procedural regularity. The facts of this case, however, require the Court to transcend such concerns, grant relief, and fashion a remedy.

While the Navy rested its case entirely upon the administrative record, Plaintiff

---

4. Defendants cite two District of Columbia Circuit cases for the proposition that later analyses and mitigation measures that demonstrate that no issue remains for remand may be considered in reviewing an agency's NEPA compliance: *Tongass Conserv. Soc. v. Cheney*, 924 F.2d 1137, 1140 (D.C.Cir.1991); *Friends of the River v. F.E.R.C.*, 720 F.2d 93 (1983).

These case are inapposite. In both cases, the court found that the agency had considered the environmental consequences of the projects *before* implementation and *during* the planning stages. In the more substantive *Friends of the River* case, FERC issued an order after a final EIS was issued that addressed the environmental concerns raised by the plaintiff. The court noted that the EIS would be deficient if not for the later order. The Court declined to remand because it " 'would not aid the agencies' own [environmental] decision making process,' for that process has already occurred." 720 F.2d at 106 (citation omitted). Before implementation and in support of its later order, the agency "*did*

make such an investigation, after receiving and responding to extensive comments from interested persons outside the agency, and FERC incorporated its finding in opinion accessible to the public—the July, 1982 Order." *Id. Friends of the River* thus stands for the unremarkable proposition that an EIS may be amended by later agency consideration of environmental concerns during its decisionmaking. The *Tongass* court even more unremarkably decided to consider an Addendum to an EIS, as plaintiff conceded the addition was indeed a part of the original EIS. 924 F.2d at 1140 n. 1.

Additionally, it is important to note that both cases involved EIS's. The agencies therein had taken environmental considerations substantially into account. Such is not the case here, as the Navy's *pro forma* EA does not evince such NEPA compliance. The case for remand is certainly stronger where an agency has foreclosed NEPA considerations from its decisionmaking early on in the process.

offered credible expert testimony of uncorrected environmental problems at the Peary Court site. *See, e.g.,* Findings of Fact at IV, V, & VIII. These experts took issue with the findings and conclusions of the studies relied upon by the Navy in support of its original EA. Both parties now urge the Court to determine from this conflicting evidence whether the Peary Court project will have a significant impact on the environment, much as the agency properly should have done in the first instance.[5]

This determination, however, is appropriately made by the agency and not the Court. The Court's proper function at this point is not to make this substantive determination, but rather to insure that the agency reasonably took account of all of the environmental consequences of its action before making the decision to proceed.[6] The Court makes the limited finding here that based on Plaintiff's evidence adduced in these proceedings, the agency at the time the EA was filed, failed reasonably to consider the environmental consequences of its decision to proceed as required by NEPA. Therefore, a remand to the agency for further proceedings consistent with NEPA and this opinion is appropriate. The Navy will be ordered to prepare an adequate EA within forty-five days from the date of this Order.

B. *Injunction*

■ The Court finds that Plaintiff has satisfied the prerequisites to the injunctive relief sought.

Plaintiff has demonstrated that irreparable harm will result from construction of this project. As explained above, in the absence of an adequate EA, the Court is unable to determine if the project will have a significant impact on the environment. The Court is similarly unable to evaluate the Navy's mitigation measures. Therefore, in the absence of an injunction, Plaintiff may suffer the precise irreparable harms sought to be prevented by this action. Plaintiff has shown that serious and unresolved questions remain as relate to, *inter alia,* stormwater runoff and flooding, contamination of the Lens aquifer, increased traffic and congestion, and destruction of specimen trees and aesthetic resources. Irreparable harm results where environmental concerns have not been addressed by the NEPA process. *See Sierra Club v. Marsh,* 872 F.2d 497, 504 (1st Cir. 1989) (affirming injunction based on NEPA procedural lapse because "risk implied by a violation of NEPA is that real environmental harm will occur through inadequate foresight and deliberation").

The Court additionally finds that a balance of the harms favors the Plaintiff.[7] The construction of military housing at some site in the Key West area will be delayed only by the amount of time necessary to comply fully with NEPA. Compliance has been an obligation of the government since the inception of the project, and should have been built into the project schedule originally.[8]

FINAL DECREE OF INJUNCTION

Accordingly, after a careful review of the record, and the Court being otherwise fully advised, it is

5. Of course, a finding by this Court of significant impact would necessitate the preparation of an EIS. 42 U.S.C. § 4332(2)(C). A contrary ruling would affirm the EA and FONSI.

6. If the EA had been properly prepared and the only issue in controversy was the subsequent FONSI, the Court's task would be different. In such a case, the Court appropriately determines whether the critical findings of the EA are supported, and whether the agency's decisions were reasonable. *See, e.g., C.A.R.E.,* 844 F.2d at 1570.

7. By Order dated March 6, 1992, this Court deferred ruling on Magistrate Judge Brown's Report and Recommendation of February 25, 1992 on Plaintiff's motion for a preliminary

injunction. Because this case has proceeded to a trial on the merits, the Magistrate Judge's Report and Recommendation is now moot.

8. Defendants have submitted an affidavit concerning the costs of delay from the construction contractor at the Peary Court site. Defendants entered into a contract with the construction company several months after this litigation was commenced, and were fully aware that delay would occur if Plaintiff prevailed. The harm from delay is a result of the Navy's failure to follow NEPA procedure, and subsequent establishment of its own construction schedule.

ORDERED and ADJUDGED that the determination of Defendants to utilize the Peary Court site in the City of Key West for military housing is in violation of the National Environmental Policy Act of 1969, 42 U.S.C. §§ 4321 *et seq.*, and regulations promulgated thereunder, 40 C.F.R. §§ 1500 *et seq.* It is further

ORDERED and ADJUDGED that Defendants, its officers, servants, agents, employees and contractors, including but not limited to Caddell Construction Company, Inc., of Montgomery, Alabama, be and the same hereby are permanently RESTRAINED and ENJOINED from commencement of construction of military housing at the Peary Court site located within the City of Key West, Florida or taking any other actions in furtherance thereof PENDING the preparation of an Environmental Assessment in conformity with 42 U.S.C. §§ 4321 *et seq.* and regulations promulgated thereunder, and consistent with this Opinion. Said Environmental Assessment shall be PREPARED and COMPLETED no more than forty-five (45) days from the date of this Order, but may at Defendants' option be completed in less time. The injunction granted hereby shall be DISSOLVED automatically by its expiration five (5) days from the date said Environmental Assessment is issued. Defendants may use, employ, and otherwise incorporate any previously prepared reports, analyses or studies in the preparation of said Environmental Assessment. It is further

ORDERED and ADJUDGED that this case be and the same hereby is DISMISSED. The Clerk of the Court shall CLOSE this case. The Court retains jurisdiction to enforce the provisions of this Final Order. It is further

ORDERED and ADJUDGED that each party shall bear its own cost and attorneys' fees of this litigation, as Defendants' litigation position was substantially justified. It is further

ORDERED and ADJUDGED that the Report and Recommendation of February 25, 1991 be and same hereby is MOOT.

DONE and ORDERED in chambers at the United States District Courthouse, Federal Courthouse Square, Miami, Florida, on this 30th day of March, 1992.

APPENDIX

ENVIRONMENTAL ASSESSMENT

FOR

PROJECT–FA17

NAVY FAMILY HOUSING
AT PEARY COURT

NAVAL AIR STATION, KEY WEST, FL

September 1988

This assessment has been prepared by Southern Division, Naval Facilities Engineering Command in accordance with OPNAVINST 5090.1 in compliance with the National Environmental Policy Act

INTRODUCTION

This document is an Environmental Assessment (EA) for the proposed construction of 160 units of junior enlisted personnel housing. The preferred site for this project is the Perry Court area within the Key West City limits, south of Trumbo Point. This action has been initiated as a result of the shortage of affordable housing in the Key West area. This EA has been prepared in accordance with the Council on Environmental Quality regulations implementing the *National Environmental Policy Act* and with with OPNAV Instruction 5090.1, Environmental Protection Manual, (Department of the Navy, 1983).

I. PURPOSE AND NEED

The Key West Naval Complex is located in the City of Key West, Monroe County, Florida, approximately 156 highway miles southwest of Miami and 90 miles north of Havana, Cuba. See Figures 1 and 2. It's location has international significance in being the closest point in the United States to Cuba, Central and South America, and the Caribbean Sea. The complex includes several sites scattered along the Keys and includes the largest, unencumbered airspace available for the Navy's training on

the east coast of the United States. The Naval Air Station is the host activity.

Historically the Key West area has relied on the military, especially the Navy, as an economic base. Tourism and the military account for over 50 percent of all earnings in the area. Fluctuations in military personnel have immediate impact to the area. Recently there has been a gradual increase in military personnel which has had a positive economic impact, but has also exacerbated the demand for housing.

The availability of housing is directly related to tourism in the Keys area. Recently, the Florida Keys have experienced a significant increase in tourism partially attributed to the renewed interest in travelling within the United States. This has been compounded by significant increases in the number of students vacationing in the Keys during spring break. Increased tourism has created two problems concerning affordable housing in Monroe County. First and foremost, owners of multi-family rental units can get a higher return renting a unit during the peak season than can be generated from yearly leases among local residents or seasonal employees. Second, increased tourist trade has forced restaurants, resorts, and retail establishments to hire additional personnel who need affordable housing. Unlike many resort areas, the Keys also face a shortage of developable land.

## FIGURE 1
### Regional Map

FIGURE 2

SITE MAP

1568

FIGURE 3

No new military housing has been built in the area since the military build-up of the 1960's and early 1970's. There has actually been a decrease in military housing due to the demolition of Wherry Housing Units at Peary Court in the early 1980's. Currently there are 168 families on the waiting list for military housing in Key West. With the expected increase in both Navy and Coast Guard personnel over the next several years, this number will grow. Key West has been declared a critical housing by Department of Defense.

Peary Court is located in the City of Key West, adjacent to and south of Trumbo Point, and was formerly the site of Wherry Housing. From this location personnel assigned to NAS Key West or any of the other tenant commands would be able to commute by car to any of the various sites that comprise the Naval complex of Key West. The most remote site is less than ten miles away. The Peary Court site contains 28.65 acres of land. The Key West Federal Credit Union currently leases 1.08 acres of this land and will remain there after construction is complete.

## II. ALTERNATIVES

### A. Proposed Action

The proposed action is to construct 160 housing units for junior enlisted perrsonnel at Peary Court. Units will be two bedroom with approximately 950 square feet each. The proposed site is adjacent to the Key West Historic District which was listed on the National Register of Historic Places in 1971. This will necessitate that the external architecture of the housing units take the surrounding architecture into consideration to ensure compatibility and continuation of the Key West theme.

The advantage to this site is that it is owned by the Navy, it is in the vicinity of other Navy housing and community support facilities, it is not encumbered by man-made constraints such as ordnance, airfield safety or high noise, and it conforms to the land use proposed by the approved Naval Complex Key West Master Plan. Housing is the best use of the land by the Navy.

The preferred site is available, has been used for Navy housing in the past, is compatible with surrounding land uses, has utility service lines in place (conditions unknown), and is close to existing Navy infrastructure.

### B. Locate on Another Site

This alternative was rejected because there is no other Navy-owned land available that has the advantages of the preferred site. Non–Navy land is practically non-existent and would require the expenditure of capital funds for land purchase.

### C. No Action

The no action alternative will result in the continued shortage of suitable, reasonably priced junior enlisted personnel housing, and will only exacerbate current shortages previously described. For this reason, the no action alternative has been eliminated.

## III. AFFECTED ENVIRONMENT

Geologically, the Florida Keys form an arcuate chain of small limestone islands extending 150 miles from Miami to Key West. The Keys are divided into the Upper Keys (narrow elongate islands parallel to the trend of the arc) and the Lower Keys (land masses with axes perpendicular to the arc). The Upper Keys extend from Soldier Key in Biscayne Bay to Bahia Honda Key. The Upper Keys surficial outcrop consists primarily of Key Largo Limestone (coral reef rock). The Lower Keys begin at Big Pine Key and extend to Key West and beyond to the Marquesas Keys.

The uppermost geologic formation in the lower Florida Keys is the Miami Oolite. This unit, found at each study site at NAS–Key West, is approximately 20 feet thick and is composed of sand-sized rounded accretionary grains mixed with carbonate sands and shelly material (White, 1970).

The geologic units underlying the Miami Oolite, in order of increasing depth, are: the Key Largo limestone (composed of cemented coral reef rubble and shelly material to a depth of roughly 250 feet), Tamiami Formation (a limestone containing fine sand, clayey sand, and gray-green clay to a depth of 900 feet), Hawthorn Formation

(consisting of blue-green clay and marl with varying amounts of quartz sand and gravel to a depth of 1,100 feet), and the Tampa Formation (a sandy limestone to a depth of 1,200 feet).

The Peary Court area was previously used for Navy housing. Trumbo Point Annex, adjacent to the proposed site (See Figure 3), includes three piers used by the Navy and U.S. Coast Guard, a 300 room Bachelor Officer Quarters, a fuel farm, a seaplane hangar, two swimming pools, and 193 family housing units. The non-military areas around Peary Court are primarily moderate-density residential units with some light commercial establishments.

A portion of this site is currently being leased by the Key West Federal Credit Union, who will remain after the project is completed. Other parts of the site have been converted to two softball fields and associated recreational uses. This recreational area is licensed to the City of Key West. The license can be terminated at any time by either the Navy or the City. The license is scheduled to automatically expire in March 1990. With the proposed project being in the FY-90 program, construction will most likely not start until after this license has expired in March, therefore no problems are anticipated.

The military complex at Key West is a critical element of the U.S. national defense posture in the Caribbean and Central America. It also provides a major source of economic support for the Key West area, being responsible for 23 percent of all earnings. Tourism is responsible for 29 percent of all earnings and is the major factor in employment in Key West. Other economic activities of importance to the Key West area involve marine-related industries, retirement and seasonal residences, and export business.

The overall percentage distribution of land uses in Key West is as follows (City of Key West, 1981):

| | |
|---|---|
| State Park (Fort Zachary Taylor).... | 2% |
| Naval Real Estate.................. | 13% |
| Historic Preservation District ....... | 12% |
| Commercial ........................ | 21% |
| Residential ........................ | 49% |
| Industrial ......................... | 3% |
| | 100% |

The Key West Historic District takes in all lands between the former Naval Station and Peary Court, from Angela Street to approximately one block south to the city's northern waterfront. The Key West Historic District was listed on the National Register of Historic Places in 1971. Land use and structures in the Historic District are monitored by the Old Island Restoration Committee (OIRC), whose permission is required for any modifications costing more than $100. The Historic District was recently expanded by the City of Key West for purposes of land use control, but the expansion area is not listed on the National Register. Two special zoning categories, HP-1 and HP-2, apply to all lands in the National Register Historic District. Most lands between the former Naval Station and the northeast frontage of Simonton Street are zoned HP-2, a very liberal category oriented toward commercial uses. The HP-1 zoning in the remainder of the Historic District permits moderate-density residential uses with very limited commercial development.

Historically, availability and cost of public utilities in Key West have been a problem. However, recent efforts have been made to increase capacities of these public utilities. The completion of a new potable water line from Florida City and new reverse osmosis plants have helped to solve the area's potable water demand. The city is currently under a moritorium prohibiting new sewer connections because of inadequate sewage treatment. A new treatment plant is under construction that would serve the proposed new family housing units. This treatment plant is scheduled to begin operation in October 1988 and will have a capacity of 10 MGD. It is estimated that the new housing will contribute 56 KGD. The new plant is big enough to handle the added amount and still have unused capacity for future growth. The energy supply problem in the lower Keys is also improving as a result of new equipment added to the overall system and as a result of the construction of a new tie-in line to the Florida Keys Electric Cooperative System in Marathon. The city

has also undertaken a capital improvement program to construct a solid waste incinerator at the Stock Island landfill. Initial design capacity for the incinerator will include a 25 percent reserve for future growth.

A detailed analysis of the environmental and socioeconomic conditions of Key West is contained in the Environmental Assessment for the former Naval Station, Truman Annex/Naval Air Station, Key West, Florida, and the Gulf Coast Strategic Homeporting Environmental Impact Statement.

## IV. ENVIRONMENTAL CONSEQUENCES

This section will address both the direct and indirect environmental effects of the proposed alternatives and mitigation measures.

### A. Biological Resources

No significant biological impacts would result from the construction of housing on this site. The proposed site was previously used for Navy housing. It is relatively flat with a few moderate-size trees. Otherwise, it is free of substantial vegetation. There is no evidence that any threatened or endangered species of plant life or wildlife occupy this land. No wetlands will be impacted.

### B. Noise

There will be no significant increase in noise generated as a result of this project. There may be a slight increase during the construction phase but this will be temporary. There will also be a slight increase in noise due to the expected increase in traffic associated with the new housing units.

### C. Air

There will be no significant increase in air pollution due to the proposed action.

### D. Hydrology

Key West is generally flat with surface elevations ranging between 0 to 15 feet msl. Annual rainfall is approximately 40 inches per year, 70% of which is estimated to be lost to the atmosphere by evapotranspiration. Remaining either percolates rapidly into the permeable surficial sediments or is conveyed quickly to the sea via the storm drainage system. At the site, drainage is very suitable for construction due to previous site improvements for former Wherry Court housing and more recently the credit union and softball fields. Drainage can be handled through the existing system with minor improvements. An interior loop road from Wherry Court still exists which acts as part of the existing drainage system.

### E. Cultural Resources

Because there are no significant cultural resources on the land proposed for this action, no significant impacts to cultural resources are expected. Compliance with requirements for juxtaposition of new construction with the Historical District will be ensured.

### F. Traffic and Circulation

Although there will be an increase in approximately 240 vehicles utilizing the streets and intersections around Peary Court, there should be no significant increase in traffic congestion. The existing roadway system within Peary Court will be slightly modified and the existing entrance along Palm Avenue will be relocated and realigned so as to intersect the signalized intersection providing access to Trumbo Point.

This, along with the existing entrance with Southard Street, should provide adequate access to the housing area. Several conceptual roadway plans will be developed during design and will be coordinated through the appropriate city planning officials.

### G. Land Use and Visual Resources

Construction of the proposed housing units at Peary Court will not conflict with any known plans, policies or controls for the area. Zoning of the surrounding areas is compatible with family housing. Design of the housing units will take into consideration the proximity of the Key West Historic

District. A description of this project has been filed with the State of Florida Clearinghouse for dissemination to all applicable state regulatory and planning agencies. Any comments received from these agencies will be fully coordinated and resolved before implementation. Applicable permits relating to storm water, potable water and sewage will be obtained. No significant negative impacts are expected.

### H. Socioeconomics

#### 1. *Schools*

The relocation of 160 junior enlisted personnel and their families to the Peary Court area along with the projected increase of 104 military families in Key West by 1994 will cause an increase in enrollment at local schools. The increase will be due to an increase in the size of Coast Guard ships at Key West and an anticipated increase in the number of Navy personnel. The schools to be effected are Glynn Archer Elementary, Horace O'Bryant Middle, and Key West High. At no time will the total affect of additional enrollment be greater than 160 children. Kerry Highsmith, the Director/Team Leader of the Business Management Complex for Monroe County Schools in Key West, has indicated that this influx will not adversely effect the schools involved. Adequate space is available for those students. No significant negative impacts are expected.

#### 2. *Economy/Employment*

The proposed project could produce a relatively small but beneficial indirect impact on the local economy and employment opportunities through the construction of the new housing units. Money paid in wages and fees to local construction firms and subcontractors would provide positive economic benefits throughout the area. No significant negative impacts are anticipated.

#### 3. *Taxation and Revenue*

All of the land involved in the proposed action is currently owned by the Navy, and is therefore not subject to property taxes.

#### 4. *Housing*

The proposed action will have a beneficial impact on military housing in the area. It is not expected to have a significant impact on the local civilian housing market.

### I. Energy Resources

Due to recent improvements in the electrical system and tie-in to the Florida Keys Electric Cooperative System, no problems in making connections necessary to support this project are anticipated. There is limited potential for future development on Key West and current capacity of the power system is expedted to handle any new load requirements. There are no significant negative impacts expected.

## V. CONCLUSIONS

It is concluded that the proposed project will have no significant adverse effects on the environment, and that there has not been, nor is there currently any known controversy concerning this project. The project will result in improved living conditions for junior enlisted military personnel assigned to the Key West area. This project has been coordinated through the Florida State Clearinghouse. Their response is attached.