C.A.R.E. NOW, INC., Jerry P. Cram, Charles L. Feltus and Robert Lundsten, Petitioners,

v.

FEDERAL AVIATION ADMINISTRATION, Respondent.

No. 87–8784.

United States Court of Appeals, Eleventh Circuit.

May 18, 1988.

should dismiss the petition unless it finds that each of these elements has been established.

H. Wayne Phears, Phears & Dailey, Michael A. Dailey, Norcross, Ga., George E. Butler, II, Atlanta, Ga., for petitioners.

Elizabeth Ann Peterson, Appellate Section, Dept. of Justice, Lands & Natural Resources Div., Washington, D.C., Sharon Douglas Stokes, Asst. U.S. Atty., Atlanta, Ga., for respondent.

Before JOHNSON and HATCHETT, Circuit Judges, and ESCHBACH[*], Senior Circuit Judge.

HATCHETT, Circuit Judge.

C.A.R.E. Now, Inc., a citizens group, petitions this court to review the Federal Aviation Administration's (FAA) order approving a runway extension at DeKalb–Peachtree Airport (PDK). The petitioner urges this court to closely review the FAA's "Finding of No Significant Impact" (FONSI) on the environment.[1] We review only to determine if the record supports the critical findings and if the agency's decisions were reasonable. Because we find that the FAA decision was reasonable, we deny the petition for review.

## FACTS

Petitioner, C.A.R.E. Now, Inc., (Citizens Against Runway Extension Now) is a non-profit civic organization consisting of homeowner associations and neighborhood groups in areas encircling PDK. Petitioners Jerry P. Cram, Charles L. Feltus, and Robert Lundsten are individual petitioners residing in neighborhoods near PDK. The petitioners oppose a proposal which would at PDK extend runway 2R–20L by 1,000 feet. The DeKalb County Commission originally proposed the runway extension. The FAA supports the proposal and will provide financial assistance for its completion.

---

* Honorable Jesse E. Eschbach, Senior U.S. Circuit Judge for the Seventh Circuit, sitting by designation.

1. We have jurisdiction to review the FAA's final order under section 1006 of the Federal Aviation Act, 49 U.S.C. § 1486.

The proposal includes the 1,000–foot runway extension, a corresponding extension of the parallel taxiway, and the installation of approach lights in the new pavement. The proposal explicitly maintains the current loading requirement of 66,000 pounds dual wheel. The purpose of the extension is to provide an increased margin of safety on runway 2R–20L. Although corporate jets currently use runway 2R–20L, the existing runway length of 5,000 feet is insufficient to satisfy optimum safety requirements for corporate jet operations. Aircraft approaching from the northeast will not benefit from the runway extension because of trees, power lines, and roads which obstruct the approach to that runway.

The proposal to extend the runway comes in a context of greater growth and expansion at PDK. In 1978, the FAA funded and approved a long-range plan for PDK. This plan designated PDK to become the primary general aviation reliever airport for Atlanta's Hartsfield International. Pursuant to this plan, the FAA funded the installation of a precision instrument landing system to accommodate significantly increased jet traffic at PDK. In addition, the north terminal area of PDK underwent a major expansion. A new air traffic control tower is also currently under construction.

## PROCEDURAL HISTORY

In 1985, DeKalb County presented an airport layout plan which recommended the runway extension. The FAA approved the airport layout plan. In order to comply with the National Environmental Policy Act of 1969 (NEPA), DeKalb County hired a private consulting firm to prepare an environmental assessment (EA) to ascertain the project's impact on the environment. The EA predicted that noise exposure levels surrounding PDK would increase from 16,800 to 19,300 persons because of the runway extension over the 5–year period following completion of the extension. To mitigate the increased noise exposure, the EA proposed two measures. The first was an informal preferential runway use program designed to reduce the number of jets taking off in a southerly direction over the most dense residential populations.

The second mitigation measure was the delayed departure procedures program in which aircraft departing to the south would begin takeoff 1,000 feet farther north than the current takeoff point. By beginning takeoff at a point 1,000 feet farther back, the aircraft would be able to gain a higher altitude before reaching populated areas thereby reducing the severity of the noise level in residences directly beneath the aircraft. Despite the decrease in the overall noise level caused by this mitigation measure, the EA concluded that the higher altitude would mean a broader range of noise dispersion, causing an additional 300 homes to be impacted by noise levels considered disruptive. The EA further concluded that air quality would not be significantly impacted because the proposed project would not increase airport capacity.

On September 3, 1986, approximately 2,000 citizens attended a public hearing conducted by DeKalb County and submitted 3,500 comments. In November, 1986, DeKalb County filed the final EA.

After analysis of the methods employed and the conclusions drawn in the EA, the FAA issued its finding of no significant impact (FONSI). The FONSI noted that the EA had adequately discussed eleven development alternatives, including the alternatives of the use of another airport, the extension of another runway, the "do nothing" alternative, and variations and combinations of each of these alternatives. The FONSI also concluded that the EA complied with established FAA procedures in its methodology. Although the FAA raised questions about the EA's estimation of total increased airport capacity in the next five years, the accuracy of these estimations was not critical to determine the impact on the environment caused *solely* by the runway extension. The FAA did not dispute the EA's conclusions regarding only those impacts which were the result of the expanded runway. In this regard, the FONSI adopted the EA's conclusion that

approximately 2,500 more persons would be affected upon completion of the project. Implementation of the EA's proposed mitigation measures, however, would abate that increased exposure.

The petitioners found the FONSI inadequate and therefore filed this petition for review. Specifically, petitioners assert that the proposal creates a reasonable possibility of a significant impact on the human environment, requiring the preparation of an environmental impact statement (EIS) under NEPA. In addition, the petitioners assert that the Airport and Airway Improvement Act of 1982 (AAIA) requires that the FAA render written findings that (1) no feasible alternative exists and (2) that all reasonable steps have been taken to minimize adverse effects, whenever a major runway extension having a significant impact on natural resources is constructed. 49 U.S.C. § 2208(b)(5). The petitioners further contend that the FONSI failed to address several available alternatives, failed to consider the cumulative impacts of the extended runway in the context of other improvements, and unfairly relied on speculative mitigation measures.

## ISSUES

The issues are: (1) whether the impacts as presented by the FONSI were "significant" so as to require an environmental impact statement pursuant to NEPA; (2) whether the FONSI was deficient because the FAA failed to determine whether prudent alternatives to the project existed; (3)

whether the FONSI was deficient because the FAA failed to consider the cumulative impact of past, present, and reasonably foreseeable actions in finding that the project would not significantly impact the environment; and (4) whether the FAA erred in considering speculative mitigation measures in concluding that the project would have no significant impact on the environment.

## DISCUSSION

■ Section 102(2)(C) of NEPA, 42 U.S.C. § 4332(2)(C), requires a federal agency to prepare an environmental impact statement (EIS) when a major federal action significantly affects the quality of the human environment.[2] The object of NEPA is to require federal agencies to consider environmental values when making decisions. The initial responsibility of the federal agency is to determine the extent of the impact. An environmental assessment (EA) is an authorized tool for determining the extent of the environmental impacts. 40 C.F.R. § 1508.9(a)(1). If the EA concludes that the impacts are significant, the agency must prepare an EIS. In determining whether the impact is significant, the agency has broad discretion. This discretion is not unlimited, however, and this court must review the agency's finding under a standard of reasonableness, not under the narrower standard of arbitrariness or capriciousness. *Manasota–88, Inc. v. Thomas*, 799 F.2d 687, 691 (11th Cir.1986); *Save Our Ten Acres v. Kreger*, 472 F.2d 463, 465 (5th Cir.1973).[3]

2. Title 42 U.S.C. § 4332(2)(C), in pertinent part, provides:
 The Congress authorizes and directs that, to the fullest extent possible: (1) the policies, regulations, and public laws of the United States shall be interpreted and administered in accordance with the policies set forth in this chapter, and (2) all agencies of the Federal Government shall—
 . . . .
 (C) include in every recommendation or report on proposals for legislation and other major federal actions significantly affecting the qualify of the human environment, a detailed statement by the responsible official on—
 (i) the environmental impact of the proposed action,

 (ii) any adverse environmental effects which cannot be avoided should the proposal be implemented,
 (iii) alternatives to the proposed action,
 (iv) the relationship between local short-term uses of man's environment and the maintenance and enhancement of long-term productivity, and
 (v) any irreversible and irretrievable commitments of resources which would be involved in the proposed action should it be implemented.

3. Generally, judicial review of agency action is governed by the Administrative Procedure Act, specifically 5 U.S.C. § 706(2)(A) under which "the reviewing court shall ... set aside agency actions, findings and conclusions found to be—

## I.

■ The petitioners contend that the FAA applied an incorrect standard in determining whether an EIS was required. Specifically, petitioners argue that the FAA required a showing of certainty of environmental harm rather than a reasonable possibility that the project would cause significant environmental impact. *Kreger* at 467 ("if the court finds that the project *may* cause a significant degradation of some human environmental factor ... the court should require the filing of an impact statement"). Contrary to petitioners' contention, the FONSI speaks in terms of "potential impact." In fact, the FONSI conceded the possibility that an additional 2,500 persons would be exposed to noise levels in the disruptive range if the project were completed without mitigation measures.[4] The FAA employed methods for projecting potential impact which were legally adequate. *See City of Aurora v. Hunt,* 749 F.2d 1457, 1462 (10th Cir.1984) (courts owe great deference to an agency's methodology in its area of expertise); *Sierra Club v. U.S. Dept. of Transportation,* 753 F.2d 120, 128 (D.C.Cir.1985) (clearly within the expertise and discretion of the agency to determine proper testing methods).

■ The petitioners also contend that the FONSI's projected noise increases do not consider the possibility that the runway extension will pave the way for larger classes of aircraft and heavier loads by the currently authorized aircraft. To support this contention, the petitioners cite statistics that forecast significant increases in airport traffic in the upcoming years. These data, however, are not persuasive because PDK will experience increased traffic regardless of whether the runway is extended. Furthermore, the proposal expressly maintains the current weight limitation of 66,000 pounds. The proposed runway extension is not designed to accommodate operations by aircraft larger than the ones currently using PDK. Therefore, the petitioners' fear that the runway extension will cause a significant impact because of the introduction of larger types of aircraft and heavier loads is unjustified. The primary consequence of the runway extension will be enhanced safety for the types of aircraft which currently use PDK. The numbers of those types of aircraft will inevitably increase given the growth of the Atlanta area. The effect of the runway extension on the number and size of aircraft that use PDK, however, is insignificant.

■ Because the runway extension will not be the cause of the increase in airport capacity, the extension will not have a significant impact on air quality. The AAIA standard for requiring the FAA to render written findings is identical to the NEPA standard: that the runway extension have a *"significant impact* on natural resources." Therefore, the FAA's findings also withstand the petitioners' AAIA attack. We hold that the FAA reasonably

arbitrary, capricious, an abuse of discretion or otherwise not in accordance with law." *Manasota–88* and *Kreger* require a higher degree of scrutiny by the standard of reasonableness, however, when the agency decision is not to prepare an EIS under NEPA. In addition to the Fifth and Eleventh Circuits, the Eighth, Ninth, and Tenth Circuits employ the reasonableness standard in reviewing an agency's decision not to prepare an EIS. *Winnebago Tribe of Nebraska v. Ray,* 621 F.2d 269, 271 (8th Cir.), *cert. denied,* 449 U.S. 836, 101 S.Ct. 110, 66 L.Ed.2d 43 (1980); *Foundation for North American Wild Sheep v. U.S. Department of Agriculture,* 681 F.2d 1172, 1177–78 (9th Cir.1982); *Park County Resource Council, Inc. v. U.S. Dept. of Agriculture,* 817 F.2d 609 (10th Cir.1987). The First, Second, Fourth, and Seventh Circuits, however, employ the arbitrary and capricious standard of review in EIS cases. *Grazing Fields Farm v.*

*Goldschmidt,* 626 F.2d 1068, 1072 (1st Cir.1980); *Hanly v. Kleindienst,* 471 F.2d 823, 828–29 (2d Cir.1972), *cert. denied,* 412 U.S. 908, 93 S.Ct. 2290, 36 L.Ed.2d 974 (1973); *Webb v. Gorsuch,* 699 F.2d 157, 160 (4th Cir.1983); *Nucleus of Chicago Homeowners Ass'n. v. Lynn,* 524 F.2d 225, 229 (7th Cir.1975), *cert. denied,* 424 U.S. 967, 96 S.Ct. 1462, 47 L.Ed.2d 734 (1976).

**4.** The level at which noise is determined to be disruptive is at or above 65 Ldn. An Ldn is a measure for noise level which takes into consideration the increased annoyance from nighttime noise. Seventy-five Ldn is considered a severe annoyance. At 65 Ldn, more than 50–percent of exposed people said they were occasionally awakened by the noise. Forty percent said the noise kept them from going to sleep. DeKalb County EA, Appendix B.

concluded that the proposed runway extension would have no significant impact on the human environment.

## II.

Petitioners also contend that the FAA's analysis of the proposal failed to consider the full spectrum of alternatives in reaching its conclusion. They argue that the FONSI did not consider all the alternative forecasts of growth at PDK. The petitioners' argument that the FAA's growth estimates for PDK were understated is misguided because the runway expansion will not be the cause of the growth or decline of PDK. The total future growth of PDK is not the issue in this case. Rather, it is that portion of the growth that will be caused by the runway extension alone. Therefore, the petitioners' argument that alternative forecasts of future growth at PDK should have been used in determining whether the project would significantly impact the environment is without merit.

The petitioners also contend that the most reasonable alternative to the proposed project would be a graded and grassed overrun equal in length to the proposed runway extension. The FAA considered this "do nothing" alternative. With the project, a substantial number of aircraft will be able to take off from a position 1,000 feet farther back than previously possible. Therefore, these aircraft will be able to gain a higher altitude before reaching many of the exposed neighborhoods, thereby reducing the severity of the noise level. When compared with the "do nothing" alternative and considered in light of other mitigating factors, the FAA concluded that the proposal will actually result in a decrease in the severity of the noise level.

The petitioners also contend that the FAA failed to adequately consider lengthening a parallel, but shorter, runway by 2,261 feet. Currently, this alternate runway cannot support jets. Not only would this alternative be more expensive because it requires more than double the extension, but also this alternative would supply PDK with double the capacity to accommodate

jets. Two runways capable of handling jets would increase airport capacity resulting in adverse environmental impacts. Therefore, the FAA rejected this alternative. Eleven alternatives were considered. Our task is not to choose the best alternative, but to ascertain that the FAA made a "reasoned choice" among these alternatives. *Life of the Land v. Brinegar,* 485 F.2d 460, 472 (9th Cir.1973), *cert. denied,* 416 U.S. 961, 94 S.Ct. 1979, 40 L.Ed.2d 312 (1974) (discussion of only four alternatives sufficient as long as those alternatives are "sufficient to permit a reasoned choice"). We hold that the FAA adequately considered the comparative merits of all alternatives and made a reasoned choice in favor of the proposal.

## III.

NEPA requires that a federal agency examine not only the impact directly attributable to one project, but also the cumulative effects of that project. Cumulative effects are defined to be the impact on the environment which results "from the incremental impact of the action when added to other past, present, and reasonably foreseeable future actions regardless of what agency (federal or non-federal) or person undertakes such other actions." 40 C.F.R. § 1508.7. Cumulative effects can be both direct and indirect. 40 C.F.R. § 1508.8; *Fritiofson v. Alexander,* 772 F.2d 1225 (5th Cir.1985). Petitioners claim that the FAA viewed the runway extension in isolation instead of viewing it in the context of a broader expansion plan for PDK. Specifically, the petitioners cite the introduction of the precision instrument landing system which heightened jet traffic in the late 1970's and early 1980's. Petitioners also claim that the increased length of the runway will foreseeably lead to the introduction to PDK of larger aircraft and heavier loads. Petitioners argue that ten years of development at PDK, without the preparation of a single EIS, have proceeded absent any analysis of the cumulative impacts of the expansion in whole. The terms of the proposed runway extension, however, forbid the introduction of new

types of aircraft and heavier loads. This proposal is unrelated to previous projects which adapted PDK for jets because the current length of the runway is already sufficient, though marginally safe, to support jets. Because cumulative impacts include only the indirect and direct *effects* caused by a project, speculation as to the use of PDK by larger types of aircraft and heavier loads could never be a cumulative *effect* because the proposal itself forbids that effect. Furthermore, an increase in capacity is inevitable at PDK given the projected growth of Atlanta and the strain on Atlanta's Hartsfield International. This increased growth at PDK is not attributable to an extended runway. The effect caused by the runway extension will be a higher percentage of safe landings, not a higher number of planes landing. We hold that the FAA's limited analysis of cumulative effects was warranted given the limited effect, direct or indirect, of the proposal.

## IV.

Finally, the petitioners contend that the FAA's consideration of mitigation measures was too speculative to offset the admitted increase in noise exposure due to the project. Both sides agree that absent the mitigation measures, the project will cause an additional 2,500 people to be subjected to disruptive noise levels. The petitioners would discount any reliance on the mitigation measures because these measures are voluntary programs. In fact, however, at least one mitigation measure, the preferential runway use program, has been used experimentally already and found manageable. Runway extension will allow fuller implementation of this program. Upon full implementation, noise levels are predicted to decrease from existing levels by 10-percent.

 When mitigation measures compensate for otherwise adverse environmental impacts, the threshold level of "significant impacts" is not reached so no EIS is required. *Cabinet Mountains Wilderness/Scotchman's Peak Grizzly Bears v. Peterson,* 685 F.2d 678, 682 (D.C.Cir.1982). Agency consideration of voluntary noise abatement programs as mitigation to potentially adverse environmental impacts is appropriate. *Sierra Club v. United States Dept. of Transportation,* 753 F.2d 120, 129 (D.C.Cir.1985). The FAA's findings impose these mitigation measures on DeKalb County as conditions precedent to the construction of the runway extension. This court must consider these mitigation measures because they were imposed as conditions of the agency action. *Louisiana v. Lee,* 758 F.2d 1081, 1083 (5th Cir.1985). FAA consideration of the mitigation measures was not only appropriate, but required. The mitigation measures will reduce the overall noise level for the majority of residents. The delayed departure procedures program, however, will increase the number of families exposed to this overall reduced noise level because aircraft at higher altitudes disperse noise across a broader range. We hold that the FAA finding that the mitigation measures reduce the potential environmental impact to an insignificant level was a reasonable conclusion.

In conclusion, the utility of NEPA is apparent in this case. Without NEPA, the FAA would not likely have imposed mitigation measures as conditions for the completion of the runway extension. With NEPA, however, the FAA was forced to consider the environmental consequences of its actions. As a result, PDK will experience enhanced safety with insignificant environmental consequences due to the implementation of effective mitigation measures.

Accordingly, the petition for review is denied.

THE PETITION FOR REVIEW IS DENIED.