**SOUTH DADE LAND CORPORATION, Paul Dimare, Rosario Strano, Dimare Homestead, Inc., Frank's Tomatoes, Inc., Iori Farms, Inc., and Torcise & Bros. Farms, Inc., Plaintiffs,**

v.

**Gordon SULLIVAN, as Acting Secretary, U.S. Department of the Army, United States Army Corps of Engineers; Arthur E. Williams, as Chief of Engineers, and Terrence C. Salt, as District Engineer, U.S. Army Corps of Engineers; South Florida Water Management District, a political subdivision of the State of Florida; Valerie Boyd, as Chair, and Nathaniel Reed, Allan Milledge, Leah Schad, Eugene Pettis, William Hammond, Annie Betancourt, Betsy Krant and Frank Williamson, Jr., as members of the Governing Board of the South Florida Water Management District, Defendants,**

and

**The Wilderness Society; National Audubon Society; Florida Audubon Society, Proposed Defendants/Intervenors.**

No. 93–2210–CV–DAVIS.

United States District Court,
S.D. Florida,
Miami Division.

Nov. 20, 1993.

Order Denying Reconsideration
Nov. 23, 1993.

William G. Earle, Earle & Patchen, P.A., Miami, FL, for plaintiffs.

Peter Outerbridge, Asst. U.S. Atty., Miami, FL and Stephen G. Bartell, U.S. Dept. of Justice, Washington, DC, for federal defendants.

Joan Lawrence, South Florida Water Management Dist., West Palm Beach, FL, for South Florida Water Management Dist.

Paul J. Schwiep, Miami, FL, for intervenors.

### ORDER DENYING MOTION FOR TEMPORARY RESTRAINING ORDER

EDWARD B. DAVIS, District Judge.

BEFORE THE COURT is Plaintiff's Emergency Motion for Temporary Restraining Order (D.E. 2).

### I. THE PARTIES

Plaintiffs are landowners, lessors, and lessees of farmlands located in the East Everglades commonly known as the Frog Pond. Defendants the United States Army Corps of Engineers ("Corps"), Acting Secretary Sullivan ("Secretary"), Williams, and Salt (hereafter also referred to collectively as the "Federal Defendants") are responsible for the design, implementation, and continued supervision of a series of projects directing water flow in the Everglades and South Dade County. Defendant South Florida Water Management District ("WMD") is a political subdivision of the state of Florida which oversees the operation of the projects under the guidance of and in partnership with the Corps. The remaining individual defendants comprise the governing board of the WMD. The Proposed Intervenors are public interest organizations whose members use and enjoy Everglades National Park (the "Park").

This case calls upon the Court to balance the need to preserve the marshland conditions in the Everglades, requiring significant introduction of water to the Park, against the livelihood of farmers in abutting agricultural lands. Plaintiffs commenced this action seeking declaratory and injunctive relief regarding specific water management practices undertaken by the Corps and the WMD pursuant to various legislative measures aimed at, *inter alia*, restoring the natural hydrologic conditions of the Park. The farmlands' extremely porous soil absorbs excess water

from projects intended to replenish the Everglades environment, leading to a rise in the water table affecting tomato plants grown in the agricultural zone. Although the federal government is in the process of implementing condemnation procedures to purchase the Plaintiffs' properties, it has not completed the necessary legislative measures necessary to date.

The Plaintiffs charge that the Defendants' current water management practices and its Taylor Slough Iteration project have caused extensive flooding of the Frog Pond farmland adjacent to the Park, in contravention of the Flood Control Act of 1948, Pub.L. No. 80–858, 62 Stat. 1171 (1948) ("Flood Control Act"); the National Environmental Policy Act of 1969, 42 U.S.C. §§ 4321–4347 (1993) ("NEPA"); the Everglades National Park Protection and Expansion Act of 1989, 16 U.S.C. §§ 410r–5 to 410r–8 ("Everglades Act"); and the Supplemental Appropriations Act of 1984, Pub.L. No. 98–181, 97 Stat. 1153, 1292 (1983) ("1984 Act"). Moreover, Plaintiffs maintain that the Defendants' practices so completely interfere with the planting and cultivation of farmlands central to the Plaintiffs' agricultural trade as to constitute a taking of property without compensation in violating of the Fifth and Fourteenth Amendments to the federal Constitution.

To protect their interests in the property and require compliance with the various federal laws which the Plaintiffs claim the Defendants are violating, Plaintiffs ultimately seek injunctive and declaratory relief regarding the responsibilities and limits imposed on the Defendants by law, and requiring an Environmental Impact Statement. In the interim, Plaintiffs request a temporary restraining order pending resolution of the issues by the Court. Specifically, they seek an order which:

1) prohibits the Defendants from flooding and continuing to maintain high water levels on Plaintiffs' farmlands;

2) prohibits continuation of the Defendants' current experimental water deliveries to the Everglades National Park;

3) orders the Defendants to a) reduce water levels in area of levee L–31W, between S–174 and S–175 to 3.5 feet or

less; b) in area of canal C–111, between S–176 and S–177 to 3.5 feet or less; c) in area of levee L–31N, between S–331 and S–176, to 4.5 feet or less; and

4) prohibits further actions by the Defendants which would prevent drainage or raise ground water levels or prevent immediate removal of rainfall in amounts up to eight inches in twenty-four hours in the South Dade County Agricultural Area.

## II.

On November 12, 1993, this Court held a status conference regarding the Plaintiffs' Emergency Motion, after which the parties agreed to reduce water levels in the Park canals and levees affecting flow onto the adjacent agricultural lands. The Court set a hearing on the Motion for Temporary Restraining Order for November 18, 1993. The parties thereafter filed numerous affidavits and documentation in support of their respective positions concerning the propriety of the temporary injunctive relief the Plaintiffs seek. On November 17, 1993, the Proposed Intervenors filed their Motion to Intervene and Request for Expedited Hearing on that motion. Before the hearing on the Plaintiffs' motion, the Court granted the Proposed Intervenors' motion for the limited purpose of presenting their arguments in opposition to the temporary restraining order, and deferred ruling on the merits of the intervention motion for the cause as a whole until a later date. After reviewing the evidence and arguments of counsel, and for the reasons discussed below, the Court determines that the injunctive relief the Plaintiffs seek is inappropriate.

## III.

◼ To prevail on their motion, the Plaintiffs must establish the four elements justifying issuance of a preliminary injunction: 1) substantial likelihood of success on the merits; 2) immediate and irreparable injury absent injunctive relief; 3) threatened harm to the Plaintiffs that outweighs any injury the injunction would cause to the nonmovant; and 4) no adverse effect to the public interest. *United States v. Jefferson County*, 720

F.2d 1511, 1519 (11th Cir.1983). Additionally, injunctive relief is inappropriate unless the subject conduct is imminent and alternative relief is unavailable. *Cunningham v. Adams,* 808 F.2d 815, 821 (11th Cir.1987). With this standard in mind, the Court turns first to an evaluation of the Plaintiffs' likelihood of success on the merits of each of their substantive claims.

### A. Flood Control Act

■ The Flood Control Act originally enacted forty-five years ago authorized a comprehensive flood control and drainage program, the Central and Southern Florida Flood Control Project ("CSF Project"). Rapid population growth and urbanization in South Florida resulted in various modifications of the Act in the decades since in its enactment. The Act and early amendments authorized extension and construction of various levees, canals, and pumping stations, predominantly aimed at providing drainage in South Dade County. Since then, the public interest in preserving the Everglades habitat has emerged as a continually more prominent factor in water management, and Congress has amended the Act to stress the increasing importance of hydration of Park territory, but has never eradicated flood control and drainage as an objective of the CSF Project.

Plaintiffs contend that the purpose of the Flood Control Act is maintenance of the CSF Project and drainage of lands in South Dade County and that the Defendants have subverted that objective by using the CSF Project to bring excessive quantities of water to the Park. Plaintiffs' interpretation of the Act and subsequent legislative amendments, however, simply does not comport with a plain reading of the language of the relevant public laws and the legislative histories accompanying them. The Federal Defendants presented a detailed chronology of the legislative amendments to the Act, tracking the development of the water management systems that service the Everglades and adjacent lands. Fed.Def.Mem.Opp. at 4–14. In particular, the 1984 Act expressly calls for implementation of an experimental program for improved water deliveries to the Park.

§ 1302, 97 Stat. 1292. This directive led to the design and implementation of the Taylor Slough Iteration.

Examination of the evolution of the legislation defining the scope and purposes of the CSF Project defeats the Plaintiffs' contention that the experimental programs currently underway contravene the purpose and legislative intent of the Act and its amendments. Against this background of Congressional intent, the Plaintiffs cannot meet their burden to establish a substantial likelihood of success on the merits of its Flood Control Act claim.

### B. Everglades Act

Plaintiffs next seek to invoke flood protection provisions of the Everglades Act. The Act expanded the Park boundaries to include an area of over 107,000 acres. § 410r–6. Moreover, the Act authorizes modifications of the Water Project to improve water delivery to the Park and restore its natural hydrological conditions ("Park Project"). § 410r–8(a). Although the Everglades Act did not expand the Park territories into the Plaintiffs' lands, it does refer to "adjacent agricultural areas," providing that the Secretary and the Water Management District must determine whether the Park Project modifications will adversely affect those lands. § 410r–8(b)(1). Moreover, the Act provides for periodic review of the effect of the Park Project on the farmlands if the Secretary makes an initial determination that no adverse effect exists. § 410r–8(e)(4). Alternatively, the Everglades Act directs the construction of a flood protection system for the adjacent farmlands if the Secretary determines that the authorized Park Project modifications will adversely affect the area. § 410r–8(d).

The Park Project, however, is currently only in the initial design stages, and construction of the specified water delivery system has not begun. Plaintiffs thus cannot invoke the flood protection system of the Act, since any right to that system necessarily depends on the completion of the project that is the basis of the Act's protection. Consequently, Plaintiffs have failed to demonstrate a likelihood of success on the merits of their Everglades Act claim as well.

### C. Takings Claims

Plaintiffs additionally assert that the Corps' actions contravene the Fifth and Fourteenth Amendments to the Constitution, and argue that the flooding of their lands amounts to a temporary taking without just compensation.[1] Additionally, the Complaint seeks declaratory judgment regarding the Plaintiffs' rights under the 1984 Act, which authorizes the Secretary to "acquire such interest in lands currently in agriculture production which are adversely affected by any modification" of the water delivery system the Act authorizes. § 1302, 97 Stat. 1292.

The Defendants raise numerous objections to the Plaintiffs' takings claims, including assertions that the Claims Court is the exclusive forum for Fifth Amendment takings claims in excess of $10,000, and arguments that the Tucker Act, 28 U.S.C. § 1491(a)(1) provides the Plaintiffs with their sole legal avenue for redress of their constitutional takings claim. Even assuming for the sake of argument that the Court could feasibly address the Plaintiffs' claims for just compensation under the Constitution or the 1984 Act, Plaintiffs could only obtain relief in the form of monetary compensation. *See Eide v. Sarasota County*, 908 F.2d 716, 721 (11th Cir. 1990), *cert. denied*, 498 U.S. 1120, 111 S.Ct. 1073, 112 L.Ed.2d 1179 (1991). As a result, the injunctive remedy they seek in the instant motion based on a purported likelihood of success on the merits of their takings claims is inappropriate even under the best of circumstances.

### D. National Environmental Policy Act

Lastly, Plaintiffs contend that the Corps improperly determined not to prepare an Environmental Impact Statement ("EIS"), as required by NEPA. NEPA declares a broad national commitment of protecting and promoting environmental quality. *Robertson v. Methow Valley Citizens Council*, 490 U.S. 332, 346–47, 109 S.Ct. 1835, 1844, 104 L.Ed.2d 351 (1989). Congress implemented NEPA to address the attention to concerns of development in governmental action, tradi-

tionally overstressed to the disadvantage of less environmentally damaging alternatives. *See North Buckhead Civic Assoc. v. Skinner*, 903 F.2d 1533, 1540 (11th Cir.1990). To this end, NEPA requires federal agencies to prepare environmental impact studies detailing the effects of their actions. *State of Alabama ex rel. Siegelman v. United States Environmental Protection Agency*, 911 F.2d 499, 503 (11th Cir.1990). The studies serve to: 1) force the agency to consider carefully detailed information about significant environmental impacts; and 2) make available to the public relevant information about significant environmental impacts. *Id.*

The parties expended considerable effort arguing the appropriate standard for review of the Corps' decision not to complete an EIS. Plaintiffs urged that the Court adopt a "reasonableness" standard in evaluating the propriety of the Corps' decision; Defendants argued that an "arbitrary and capricious" standard is appropriate. The parties agree that the arbitrary and capricious standard controls upon review of the adequacy of an EIS. *North Buckhead Civic Assoc. v. Skinner*, 903 F.2d 1533, 1538 (11th Cir.1990) (*citing Marsh v. Oregon Nat. Res. Council*, 490 U.S. 360, 375–78, 109 S.Ct. 1851, 1860–61, 104 L.Ed.2d 377 (1989)). Prior to *Marsh* and *Skinner*, however, the Eleventh Circuit had adopted the reasonableness standard for evaluations of Environmental Assessments ("EA") and subsequent Findings of No Significant Impact ("FONSI"), *C.A.R.E. Now, Inc. v. Federal Aviation Admin.*, 844 F.2d 1569, 1572 (11th Cir.), *reh'g denied, en banc*, 854 F.2d 1326 (1988). *See also Natural Resources Defense Council v. Duvall*, 777 F.Supp. 1533, 1537 (E.D.Cal.1991). Plaintiff contends that this standard controls the determination before the Court in this case because, unlike *Skinner*, this Court must evaluate the propriety of the Corps' decision not to prepare an EIS, rather than the adequacy of a completed EIS.

The distinction so vigorously argued by the parties is largely semantic and of little practical import, as both the Supreme Court and

---

**1.** Plaintiffs devote significant time to this argument in their memorandum, but have no separate count for a takings claim in their Complaint, referring to the Fifth and Fourteenth Amendments only in the Jurisdiction and Venue clause of the Complaint.

the Eleventh Circuit have recognized. *Marsh,* 490 U.S. at 377–78 n. 23, 109 S.Ct. at 1861 n. 23; *Skinner,* 903 F.2d at 1538 n. 20. Both standards require the reviewing court to "ensure that agency decisions are founded on a reasoned evaluation of the relevant factors" and that no "clear error of judgment" exists. *Marsh,* 490 U.S. at 377–78, 109 S.Ct. at 1861. Moreover, a court analyzing agency decisions may not substitute its judgment for the agency's concerning the wisdom of the result. *Skinner,* 903 F.2d at 1539.

■ The District of Columbia Circuit, in *Cabinet Mountains Wilderness v. Peterson,* 685 F.2d 678 (D.C.Cir.1982) enunciated four criteria for reviewing an agency decision to forego preparation of an EIS.[2] The relevant criteria are whether the agency: 1) took a "hard look" at the problem; 2) identified the relevant areas of environmental concern; 3) made a convincing case that the impact was insignificant for the problems studied; and 4) convincingly established that changes in the project sufficiently reduced any established significance to a minimum. *Id.* Applying this standard to the EA and subsequent FONSI prepared by the Corps, this Court cannot find that Plaintiffs have established a likelihood of success on its NEPA claim sufficient to meet the standard for injunctive relief.

The Corps completed a final EA addressing the Taylor Slough Iteration in June 1993. *See* Aff. of Rodney D. Ghioto, Exh. 2 ("Final EA"). The study is comprehensive, identifying various facets of the problem faced by the Everglades ecosystem and developed lands in its vicinity and detailing the Iteration's effect on each. *Id.* at 27–31. The Corps also provided for a monitoring plan for the several environmental concerns. *Id.* at 33–38. The Final EA reviewed the alternatives available to continuing the test, and expressly addressed the concerns of different sectors of the public on questions regarding the test's impact. *Id.* at 5, 6–23. Indeed, a significant portion of the "Coordination with the Public" portion of the Final EA dealt specifically with concerns of agriculture in

the Frog Pond. *Id.* at 6–8, 10–17. Moreover, the Corps completed a draft EA of considerable thoroughness three months before finalizing its assessment, and conducted public hearing before making its determinations. An argument that the Corps did not take a "hard look" at the potential problems and properly identify the environmental concerns is simply unsupportable.

In addition, the Plaintiffs have failed to establish that the findings of the Final EA and reduction of any potential impact are not convincing. Although they present considerable testimony by experts and the individual farmers regarding the water levels actually present on the farms, the Plaintiffs do not dispute that, under the Corps' intended course for the Taylor Slough Iteration, water levels shall return to the levels the Plaintiffs desire by December 1, 1993. The WMD submitted expert testimony demonstrating that 1993 was a wet year, resulting in more water availability in the system, and explaining the temporary increase in water levels on Plaintiffs' farmlands. Aff. of Thomas K. Macvikar, at 3, ¶ 6. The Plaintiffs' grievance, therefore, strikes at the heart of the Corps' discretion to implement the legislatively directed program using its best judgment in balancing rival interests.

The Final EA recognizes that, during flood events, water levels in the Frog Pond would increase compared to pre-Iteration conditions. The Corps, however, weighed many interests in devising the water levels at the various levees and canals of the Park. While the levels in the Frog Pond are too high for the farmers, the levels in other portions of the Park are deemed too low by conservationists. The Corps expressly struck a reasoned balance between these competing interests. *See* Final EA at 9. It is not the proper role of this Court to reevaluate the relevant factors and reach a different conclusion, however, the Court would expect the Corps to continually evaluate design elements and their impacts over time in light of its duties to adjacent farmlands as well as the Park, as part of its monitoring function.

---

2. Courts in this district have implemented the *Cabinet Mountains* factors as guide posts in evaluations of agency decisions not to prepare an

EIS. *See, e.g., Protect Key West, Inc. v. Cheney,* 795 F.Supp. 1552, 1559 (S.D.Fla.1992) (King, J.).

This Court therefore finds that the Corps took a "hard look" at the problems raised by the Taylor Slough Iteration, appropriately identified areas of environmental concern, and convincingly determined that any impact was insignificant or sufficiently reduced to a minimum. Accordingly, the Court determines that, 1) the Final EA was adequate; 2) in deciding not to prepare an EIS, the Corps considered the relevant factors as expressed in the Final EA and 3) the result was reasonable and no clear error of judgment on the part of the Corps appears from the record. Thus, Plaintiffs have also failed to establish a substantial likelihood of success on the merits of its NEPA claim.

## IV.

Having determined that the Plaintiffs can not shoulder its burden on the first of four elements necessary to establish the propriety of temporary injunctive relief, the Court need not address the remaining four components.

Accordingly, it is

ORDERED AND ADJUDGED that Plaintiffs' Emergency Motion for Temporary Restraining Order is DENIED.

DONE and ORDERED.

## *ORDER ON MOTION FOR RECONSIDERATION AND SECOND MOTION FOR TRO*

BEFORE THE COURT are Plaintiffs' Motion for Reconsideration and Second Motion for Temporary Restraining order. Plaintiffs' reconsideration motion targets this Court's November 20, 1993 Order Denying Motion for Temporary Restraining Order ("TRO Order"). Plaintiffs request that the Court examine anew its findings with regard to their Motion for Temporary Restraining Order. In support of the instant motion, Plaintiffs rely predominantly on reargument of the issues already disposed of by the Court.[1] The Court will nevertheless address

the merits of the reconsideration motion in an effort to resolve any ambiguity.[2]

## I. STANDARD OF REVIEW FOR TEMPORARY RESTRAINING ORDER

Plaintiffs first register their alarm at the Court's examination of their likelihood of success on the merits and the similarity of the Court's ruling to a ruling on a preliminary injunction. The Court can readily resolve the Plaintiffs' confusion regarding the standard involved for evaluation of the propriety of issuing a temporary restraining order. As stated in the TRO Order, a plaintiff seeking temporary injunctive relief must establish all four of the elements required for issuance of a preliminary injunction. *See United States v. Metropolitan Dade County*, 815 F.Supp. 1475, 1477 (S.D.Fla.1993). Hence the similarity of a TRO proceeding to a hearing on a preliminary injunction.

By moving the Court for temporary injunctive relief, the Plaintiffs themselves brought the question of their substantial likelihood of success on the merits of their claims to the foreground. *See* Pl.Mem.Supp. Motion for TRO at 1. The fact that the Plaintiffs devoted thirteen pages of their seventeen page memorandum in support of their Motion for Temporary Restraining Order to the likelihood of success prong belies their contention in the instant motion that they did not have a full opportunity to brief the Court on this issue. Upon the Plaintiffs' failure to meet its burden of establishing one of the four required elements, the Court need not review the remaining components of the test. *See, e.g.*, *Lucero v. Operation Rescue*, 954 F.2d 624, 627 (11th Cir.1992) (denial of preliminary injunction appropriate when movant failed to show substantial likelihood of success on the merits); *Zardui–Quintana v. Richard*, 768 F.2d 1213, 1216 (11th Cir.1985) (abuse of discretion to grant injunctive relief

---

**1.** Additionally, the Plaintiffs contend that since the TRO hearing, water has risen to even higher levels. The Court makes no comment on the credibility of this statement, an issue disputed by the Defendants and Proposed Intervenors. *See* Affidavit of Ron Mireau.

**2.** In doing so, the Court will assume familiarity with the detailed factual and procedural background discussed in the TRO Order, as well as the descriptions of the various parties.

when movant failed to establish a substantial likelihood of success on the merits).

Plaintiffs may have confused the standard applicable to an ex parte temporary restraining order with the burdens a movant for temporary injunctive relief bears upon notifying the opposition and presenting its motion to a court. Under the Federal Rules, an ex parte movant for a temporary restraining order can only prevail by establishing that irreparable injury will result before the opposing party can be heard and that notice to the opposing party is either impossible or excusable. Fed.R.Civ.P. 65(b). This standard is entirely inappropriate as a guide for the Court's determination in the case at bar, in which all parties were not only fully cognizant of the pending motion and relevant issues, but prepared voluminous written memoranda, engaged in extended oral argument and compiled substantial evidentiary material to support their respective positions at the scheduled hearing. *See Levas and Levas v. Antioch,* 684 F.2d 446, 448 (7th Cir.1982).[3]

## II. NATIONAL ENVIRONMENTAL POLICY ACT OF 1969

At the outset, the Court notes that Plaintiffs' misstate the relevant law applicable to review of an agency decision not to issue an Environment Impact Statement ("EIS") based on an Environmental Assessment ("EA") and subsequent Findings of No Significant Impact ("FONSI").[4] Section 102(2)(C) of the National Environmental Policy Act of 1969 ("NEPA"), requires federal agencies to prepare an EIS when a "major Federal action[ ] *significantly* affect[s] the quality of the human environment." 42 U.S.C. § 4332(2)(C) (emphasis added). Pursuant to Council on Environmental Quality regulations, agencies may utilize EAs to determine the extent of environmental impacts. 40 C.F.R. § 1508.9(a)(1). *See also* 33 C.F.R. § 230.10 (parallel regulation applicable specifically to the Corps).

If the EA concludes that the impact is significant, the agency must prepare an EIS, but agencies enjoy broad discretion in determining the significance of the impact. *C.A.R.E. Now, Inc. v. Federal Aviation Admin.,* 844 F.2d 1569 (11th Cir.), *reh'g denied en banc,* 854 F.2d 1326 (1988). To shoulder its initial burden, Plaintiffs must therefore demonstrate a substantial likelihood of success on its contention the Corps' FONSI was not based on a reasoned evaluation of the relevant factors. *See Marsh v. Oregon Natural Res. Council,* 490 U.S. 360, 377–78, 109 S.Ct. 1851, 1861, 104 L.Ed.2d 377 (1989); *C.A.R.E.,* 844 F.2d 1570. As discussed in the TRO Order and reviewed again below, the Plaintiff did not meet that burden.

Indeed, Plaintiffs did not even address many of the elements which the term "significantly" evokes in the context of NEPA. The term requires analysis of both "context" and "intensity" factors. 40 C.F.R. § 1508.27. Instead, Plaintiffs consistently rely on arguments regarding the purportedly imminent destruction of their business interests in the land. Their arguments, although quite sympathetic, are alone simply insufficient to require preparation of an EIS. *Image v. Brown,* 570 F.2d 517, 522 (5th Cir.1978). *See also* 40 C.F.R. § 1508.14 (stating, in definition of "human environment," that "economic or social effects are not intended by themselves to require preparation of an environmental impact statement").

Plaintiffs' first, and only novel, relevant argument is that the Corps' own regulations compel an EIS under the circumstances of the case at bar. Claiming that the Taylor Slough Iteration represents a departure from the previous water project implementation, Plaintiffs contend that 33 C.F.R. § 230.6 compels preparation of an EIS. Those sections include among actions normally requiring an EIS: "[p]roposed changes in projects which increase size substantially or add additional purposes" and "[p]roposed major

---

**3.** Plaintiffs also contend that the Court improperly treated affidavits submitted at the hearing as evidence for purposes of evaluating the Plaintiffs' burden. The Court need not expend more time on this argument than it takes to state that the parties were aware that the proceeding was an evidentiary hearing relating to the temporary restraining order motion and chose to present evidence in the form of affidavits to support their positions.

**4.** The Plaintiffs take no issue with the Court's ruling regarding their other substantive claims.

changes in the operation and/or maintenance of completed projects." § 230.6(b) & (c). Although Plaintiffs cite to these subsections, they fail to draw the Court's attention to the very next clause, which directs that "[d]istrict commanders may consider the use of an [EA] on these types of actions if early studies and coordination show that a particular action is not likely to have a significant impact on the quality of the human environment." § 230.6. Thus, even assuming for the sake of argument that the Iteration was a "change" within the meaning of § 230.6, the Corps could undertake an EA to determine whether the "normally required" EIS was necessary.[5] The question thus turns once again to the adequacy of the EA and the FONSI the Corps subsequently issued.

Plaintiffs next assert that the EA failed to address the potential impact on agricultural business and land use, not only in the Frog Pond, but in Homestead, Florida City, and other South Dade county regions, and that, although the EA admitted potential uncertainties in flooding risks in the Frog Pond, it ignored them. The EA, however, evidences a considered process in which the Corps garnered public commentary, reviewed potential alternatives, and examined the impacts on various regions and land uses within and beyond the Park. Final EA at 5–23, 27–31. Plaintiffs' attempt to extend the circumference of potential significant impacts does not rise to the level of establishing a substantial likelihood of success on the merits.[6]

Plaintiffs further contend that the Court erred in determining that the Corps had properly balanced competing interest because an EA may not properly include balancing of possible impacts. Once again, their argument misses the mark. The EA itself is an authorized tool for examining and evaluating available alternatives to the proposed

major federal action under scrutiny. See 42 U.S.C. § 4332(2)(E); 40 C.F.R. § 1508.-9(3)(b); 33 C.F.R. § 230.10(a). The task of a court reviewing an EA and subsequent FONSI is "not to choose the best alternative, but to ascertain that the [agency] made a 'reasoned choice'" among the options available. C.A.R.E., 844 F.2d at 1574. The TRO Order addresses this determination in its discussion of the balancing in which the Corps inevitably engaged before implementing the program and determining that no significant impact existed.

Lastly, Plaintiff contends that the Court improperly addressed material outside the four corners of the EA in its evaluation of the propriety of the subsequent FONSI. A principled reading of the TRO Order, however, readily reveals that any reference to evidence adduced from the affidavits was solely a practical reference point for the Court's findings, themselves based on the sufficiency of the EA. See TRO Order at 12 (detailing how Plaintiffs' arguments address the scope of the Corps' discretion to implement the authorized project). Similarly, Plaintiffs improperly characterized the Court's tangential reference to the water levels which shall hold under the project effective December 1, 1993 as the linchpin of its determination on the motion. Id.

The Plaintiffs having failed to bring to light any basis for reconsideration of its TRO Order, the Court declines to address their Second Motion for Temporary Restraining Order.[7]

Accordingly, it is

ORDERED AND ADJUDGED that Plaintiffs' Motion for Reconsideration is DENIED; Plaintiffs' Second Motion for Tempo-

---

5. The Court need not, and expressly does not, determine whether indeed the Iteration falls within the scope of § 230.6. In fact, as an "authorized project," the test may well come within the meaning of § 230.7(b), a subset of actions normally requiring an EA, but not necessarily an EIS.

6. This is not to say that the size of the affected region is not relevant to a NEPA claim. Rather, NEPA significance depends in part on context,

which in cases of site-specific actions, "usually depend[s] upon the effects in the local rather than in the world as a whole." 33 C.F.R. § 1508.27(a).

7. To the extent this Order does not address specific arguments raised in Plaintiffs' Motion for Reconsideration, the Court determines that they represent issued clearly resolved in the TRO Order which the Court need not revisit here.

rary Restraining Order is DENIED as MOOT.

DONE AND ORDERED.